UNITED STATES, Appellee

v.

WILLIAM F. MARSH, Private–1, U. S. Army, Appellant

3 USCMA 48, 11 CMR 48

No. 1526

Decided July 10, 1953

Lᴛ Cᴏʟ Herman P. Goebel, Jr., U. S. Army, and 1ꜱᴛ Lᴛ Bernard Landman, Jr., U. S. Army, for Appellant.

Lᴛ Cᴏʟ Thayer Chapman, U. S. Army, and 1ꜱᴛ Lᴛ Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

Gᴇᴏʀɢᴇ W. Lᴀᴛɪᴍᴇʀ, Judge:

Accused was tried by a general court-martial upon two charges. Charge I alleged willful disobedience of an order of a superior officer, in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684, and Charge II alleged desertion in violation of Article 85 of the Code, 50 USC § 679. He was found guilty, by exceptions and substitutions, of absence without leave, in violation of Article 86, 50 USC § 680, under Charge II, and guilty of the willful disobedience charge. He was sentenced to a dishonorable discharge, total forfeitures, and confinement for two years and six months. The convening authority approved and the board of review affirmed. We granted accused's petition to this Court for a review of his conviction. Although his petition contains four assignments of error, our disposition of two renders consideration of the others unnecessary. Accordingly, we shall limit our discussion to (1) whether there is a fatal variance between the proof and allegation under Charge I, and (2) whether the officer who convened the court-martial had authority to do so.

**49**

At the onset of the trial it was stipulated between prosecution and the defense that the accused ■■■■ ■ was placed under special orders on December 12, 1951, to proceed to Fort Lawton, Washington, for overseas shipment; and that on January 4, 1952, he surrendered himself to military authorities at Fort McPherson, Georgia, stating that he lacked sufficient funds to proceed to Fort Lawton. The evidence further shows that he was placed in the post stockade to await further orders. On January 7, 1952, the commanding officer at Fort Lawton was apprised of his presence at Fort McPherson and he requested that the accused be issued orders to proceed to Fort Lawton. On January 11, 1952, Headquarters Fort McPherson issued a special order directing that accused proceed to Fort Lawton and that the Transportation Corps furnish the necessary transportation. This is the usual travel order and it directed that costs be charged against the accused. A standing operating procedure promulgated by Lieutenant General Hodge had been adopted by the Third Army to deal with absentees. Pursuant to this, the confinement officer, Captain Sikes, on January 11, 1952, called the accused before him and read him a letter-order which is captioned "a direct order." Both the special order and the direct order were issued "by command of Lieutenant General Hodge." The first was signed by an Adjutant General officer and the second was signed by Captain Sikes. The latter repeated the body of the former by directing the accused to proceed to Fort Lawton immediately but it also contained a statement that failure to obey would subject the accused to a court-martial. At the time accused received the letter-order, Article 90 of the Code, supra, was read to the accused by Captain Sikes. The accused said he understood, and he acknowledged receipt of the order. He boarded a train for his destination the same day, but the next day when the train stopped in Tennessee he got off, and returned to his home in Knoxville. He was apprehended at his home March 25, 1952, by military authorities. The accused and other de-

fense witnesses testified that he returned to his home because he had a sick baby, that it was not expected to live very long, and that he wanted to see it again.

The specification under Charge I stated as follows:

"In that Private William F. Marsh . . . having received a lawful command at Fort McPherson, Georgia, from Captain James I. Sikes, his superior officer, . . . did, on or about 12 January 1952, willfully disobey the same."

At the time Prosecution Exhibit 1, which is the disputed direct order, was offered in evidence, defense counsel interposed an objection on the ground that it was immaterial and did not support any allegation made against the accused. He further stated that the basis for his objection was that if the exhibit was a legal order it was issued by Lieutenant General Hodge and not Captain Sikes and, therefore, it was not material to the offense alleged. His objection was overruled.

Later, at the conclusion of the prosecution's case, defense counsel moved for a finding of not guilty as to Charge I, on two grounds, namely, a fatal variance between the allegation and the proof, and a failure to establish an essential element of the offense charged since there was no showing that accused had received a lawful order from Captain Sikes. In support of that motion, defense counsel cited previous military authorities and requested that the court take judicial notice of the provisions of Army Regulations 310–25, dated May 4, 1951, to the effect that travel orders could be issued only by certain persons. This motion was likewise denied by the law officer. We conclude that both rulings were erroneous.

In discussing whether such an order, as the one relied on here, would be the order of the superior or the intermediate officer, Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, at page 574, states:

"It may happen that an order is transmitted through several intermediate commanders, or other officers,

to the individual intended to be reached: in such a case a failure to comply is a disobedience of the command of the superior from whom the mandate originally proceeded."

In interpreting this statement by Winthrop, the case of United States v. Hanold, 5 BR–JC 265, 275, states:

". . . . In passing on the order of a superior, an intermediate commander could make the order his own by the use of clear and unmistakable language indicating that he was placing his own authority behind the order. In such event a subordinate who willfully disobeyed the order would intentionally defy the authority of the intermediate commander as well as that of the superior. *Where, however, the intermediate commander is simply the agency through which the superior transmits his order, a violation of the order cannot be charged as a violation of the command of the intermediate.*" [Emphasis supplied]

Special Regulations 310–110–1, dated March 1, 1951, present the rules and customs of the Army with respect to orders. Two paragraphs shed light on the problem before us. Paragraph 2 provides in part:

"Orders are the usual means by which a commander transmits his instructions to units or individuals of his command. . . ."

Paragraph 11 provides in part:

"a. The authentication is that part of the order which contains the command line and 'OFFICIAL' section. Both command line and official section are omitted when the order is signed by the commander.

"b. (1) The command line is the phrase which states who is issuing the directive. It reads 'BY COMMAND OF . . .' when the commander is a general officer and 'BY ORDER OF . . .' when the commander is below the grade of brigadier general."

Undoubtedly, under a proper factual situation an intermediate may, by placing his authority behind the order, become the one whose order is violated. But to do this, the intermediate officer must have the authority to issue such an order in his own name and it must be issued as his, not as the representative of the superior. There were two orders and a standing operating procedure offered in evidence and each carried the command line "by command of General Hodge." The whole pattern of the procedure was predicated on the theory that the Commanding General was issuing the questioned direct letter-order through his staff section and in the instant case we have that normal procedure. Major Hatfield, Post Adjutant of Fort McPherson, testified that Captain Sikes was the confinement officer, and his authority was limited to orders which pertained to the confinement facilities. Had he been issuing an order relative to those matters, it would not have carried a command line, it would have been issued in his own name. This more necessarily follows when consideration is given to the fact that the order given by Captain Sikes would fall of its own infirmities if it were not supplemented by another order issued by Lieutenant General Hodge. This for the reason the Captain had no authority to issue an order in his own name involving travel allowances. The order which committed Federal funds was issued by the General under the authentication of an Assistant Adjutant General and the direct letter-order requiring strict compliance was the same form except it was signed by Captain Sikes. The order shows his capacity as that of a special staff officer issuing an order for and on behalf of his superior. The Government seeks to distinguish his capacity in issuing the letter-order from that of the Adjutant General issuing the special order. We perceive no material or legal difference. They were both acting for and on behalf of the Commanding General. Under those principles, the evidence does not prove the commission of the offense alleged.

We next turn our attention to the question of whether the fact that the accused violated General Hodge's order, precluded the General from convening

the court which tried the accused. A decision on this issue is necessary to dispose of the finding of guilt on the offense of absence without leave. Article 22(b), Uniform Code of Military Justice, 50 USC § 586, provides:

"(b) When any such commanding officer is an accuser, the court shall be convened by a superior competent authority, and may in any case be convened by such authority when deemed desirable by him."

Article 1(11), 50 USC § 551, defines an accuser in the following language:

" 'Accuser' shall be construed to refer to a person who signs and swears to charges, to any person who directs that charges nominally be signed and sworn by another, and to any other person who has an interest other than an official interest in the prosecution of the accused."

In determining the question of whether the convening authority is the accuser in a given case, we held in United States v. Gordon (No. 258), 1 USCMA 255, 2 CMR 161, decided March 19, 1952:

". . . . do not believe the true test is the *animus* of the convening authority. This undoubtedly was the early rule, but as we view it, *the test should be whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter*. We cannot peer into the mind of a convening authority to determine his mental condition, but we can determine from the facts whether there is a reasonable probability that his being the victim of an offense tended to influence a delicate selection. . . . ." [Emphasis supplied.]

It is clear from the facts in this record that the accused violated a direct order of General Hodge and that the latter had a personal interest in seeing his orders were obeyed. Military discipline and order is based upon obedience to superiors and every commander jealously, but rightly, requires compliance and frowns on disobedience. For that and other reasons we cannot say that a superior officer would be entirely impartial in selecting a court to try a given case where the accused was charged with willful disobedience of the order. By no means do we wish to attribute any improper motive to General Hodge in this instance but it is clear beyond cavil that he convened a court-martial to try a case when he was disqualified from doing so by statute. Certainly, the foregoing principle denies authority to the court-martial to try the offense alleged in the first specification.

The next question, however, is whether the finding of guilty of absence without leave can stand because ▪ of being the subject of a separate specification. Under ordinary circumstances General Hodge could convene a court to try the accused for that offense, for he would be interested only in his official capacity and this does not disqualify. However, the absence without leave and the willful disobedience grew out of what was substantially one transaction and if the court-martial was disqualified to try one offense, it was disqualified to try the other. To hold otherwise would be clearly in violation of the intent of Congress as expressed in the Code. If a convening authority is disqualified to convene a court to try an accused because of prejudice either real or statutory, he cannot, by including one good specification in a charge, breathe life into that part of the proceeding. He just cannot confer authority on the court-martial to proceed against the accused and the reason is obvious. If it would be inclined to support his desires to the prejudice of an accused on one specification, it would necessarily be influenced in the same manner on other specifications. In this instance, the evidence showing disobedience of the general's direct order was before the court-martial and any adverse effect that might have on the findings would not be different as between specifications. Either the court would be selected with a view to certainty of conviction on all specifications and it could be influenced improperly as to all charges, or it would be selected impartially and uninfluenced as to any

finding. Congress concluded the probability of harm to an accused was sufficient to deny to an accuser the right to convene a court and if he elects to join specifications for trial all must fall as the court is disqualified to try any. The Manual aptly states the principle in the following language: "It is unlawful for an accuser to convene a general court-martial for *the trial* of a person so accused." (Emphasis supplied.) Here it was unlawful for General Hodge to convene the court to try the accused and the findings which were returned by the court-martial as a result of that trial cannot be permitted to stand.

The decision of the board of review is reversed and a rehearing is ordered.

Chief Judge QUINN and Judge BROSMAN concur.