UNITED STATES, Appellee

v.

ROBERT A. KEITH, Private First Class, U. S. Marine Corps, Appellant

3 USCMA 579, 13 CMR 135

No. 3293

Decided December 31, 1953

CDR Robert W. Collins, USNR, for Appellant.
CDR Richard J. Selman, USN, for Appellee.
MAJ Irvin M. Kent, U. S. Army, Amicus Curiae.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This case is before the Court for a determination of the single issue of whether or not the convening authority was an accuser so as to disqualify him from referring the case for trial to a court-martial appointed by him. The accused was convicted of breaking restriction in violation of Article 134, 50 USC § 728, absence without leave in violation of Article 86, 50 USC § 680, and failure to obey a lawful order in violation of Article 92, Uniform Code of Military Justice, 50 USC § 686. The specification alleging the last enumerated offense constitutes the base for the issue which now concerns us.

The accused broke restriction at Parris Island, South Carolina, on January 21, 1953, and remained on unauthorized absence until March 13, 1953, at which time he was apprehended and returned to the South Carolina camp. Thereafter, on March 14, 1953, he was given a written order directing that he proceed from Parris Island to Camp Pendleton, California. This order was issued by the Commanding General, Headquarters Marine Corps Recruit Depot, to the accused and was signed, D. E. Shelton, by direction. We are assured the signer was acting in a representative capacity for the Commanding General when he issued the order. The accused acknowledged its receipt and it gave him explicit instructions as to the route he must follow in travelling between the two places. In addition, it advised accused that deviation from schedule constituted disobedience of an order, a serious military offense, punishable as a court-martial should direct. The accused failed to comply with the directive as on March 16, 1953, he was apprehended at his home in Walterboro, South Carolina, and this litigation ensued.

Major General Merwin H. Silverthorn was the Commanding General of the Marine Corps Recruit Depot during the period with which we are concerned, and the court-martial which tried this offense was appointed and convened by him.

Appellate defense counsel relies upon the rule announced by us in United States v. Marsh, 3 USCMA 48, 11 CMR 48. We agree that if the case at bar cannot be distinguished from that case, our decision there requires a reversal in this instance. There the accused was charged with willful disobedience of an order of a superior officer in violation of Article 90, Uniform Code of Military Justice, 50 USC § 684. The specification alleged that the accused had violated an order received by him from Captain James I. Sikes. The record established that the order was, in fact, issued by Captain Sikes for General Hodge. A method of operation had been devised by that Headquarters which, in essence, amounted to this: A direct order, apart from the necessary travel orders, would be given to an anticipated absentee to impress forcefully upon him that in the event he failed to report to his station, the violation of the direct order could be used to support a long term of confinement. Under that arrangement the punishment for an offense normally considered as being applicable to absence without authority or desertion could be increased greatly at the option of the convening authority. The procedural steps taken to carry out the plan of operation were these: That absentees in the status of Marsh were handed a written order which was designated "a direct order," issued under command of General Hodge; that the substance of the order was that the named persons were to proceed to their proper station and if they failed to arrive they would be tried for wilful dis-

obedience of the order of their superior; that a regular travel order was issued which made the direct order entirely unnecessary except for impressing upon the accused the necessity for compliance with the travel order; that the direct order was read and explained thoroughly to the recipients; that they were advised that failure to report would subject them to trial by court-martial for wilful violation of the order; and, that to impress them with the severity of any violation, Article 90 of the Uniform Code of Military Justice, supra, was read to them. That procedure was adopted and used in the case of Marsh. At this point, it is well to note that the whole success of the plan depended upon the superior officer becoming the principal actor for the Government and using the authority of his assignment and the prestige of his office as coercive factors in compelling compliance with the order. We held that under those facts and circumstances the role of General Hodge, who issued the order, was that of an accuser and that he was disqualified from convening the court to try that charge. In reversing the conviction we emphasized that Marsh was charged with wilfully disobeying a direct order of the General, who had a personal interest in seeing that his orders were obeyed. We stated at page 52:

"It is clear from the facts in this record that the accused violated a *direct order of General Hodge* and that the latter had a *personal interest* in seeing his orders were obeyed. Military discipline and order is based upon obedience to superiors and every commander jealously, but rightly, requires compliance and frowns on disobedience. For that and other reasons we cannot say that a superior officer would be entirely impartial in selecting a court to try a given case where the accused was charged with *willful* disobedience of the order. By no means do we wish to attribute any improper motive to General Hodge in this instance but it is clear beyond cavil that he convened a court-martial to try a case when he was disqualified from doing so by statute. Certainly,

the foregoing principle denies authority to the court-martial to try the offense alleged in the first specification." [Emphasis supplied.]

In addition, we reaffirmed the rationale announced in the following quotation from United States v. Gordon, 1 USCMA 255, 261, 2 CMR 161:

". . . we do not believe the true test is the *animus* of the convening authority. This undoubtedly was the early rule, but as we view it, *the test should be whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter.* We cannot peer into the mind of a convening authority to determine his mental condition, but we can determine from the facts whether there is a reasonable probability that his being the victim of an offense tended to influence a delicate situation." [Emphasis supplied.]

There are a number of factors which distinguish the instant case from the situation presented in *Marsh,* supra, and they all have a tendency to decrease the personal interest of the officer issuing the order. Here, the accused is charged with failure to obey an order in violation of Article 92; there is no issue of wilful disobedience and there is no evidence that the wilful flaunting of the authority of a superior officer was conceived as part of a plan to aggravate the nature of the crime; the order involved was little more than the usual impersonal travel order directing the accused to proceed to a certain station; conceding the order contained an additional threat of prosecution, it was required for administrative purposes; any interest in using his official position as a leverage to increase the punishment and thereby compel compliance with his order by the subordinate cannot be charged against this superior officer; and, the over-all plan did not place the commanding general in a situation where his own personal and direct order to a subordinate could be wilfully challenged. If, therefore, the general in

this case had any interest in the prosecution, it could not be charged that it grew out of a plan which revolved around a personalized status.

The punitive articles of the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951, throw some light on this problem. Article 92, supra, under which the accused was charged and convicted, is as follows:

> "Any person subject to this code who . . . having knowledge of any other lawful order issued by a member of the armed forces, which it is his duty to obey, fails to obey the same . . . shall be punished as a court-martial may direct."

Article 90, supra, which formed the basis for the prosecution of Marsh is:

> "Any person subject to this code who—(1) strikes his superior officer or draws or lifts up any weapon or offers any violence against him while he is in the execution of his office; or (2) willfully disobeys a lawful command of his superior officer; shall be punished, if the offense is committed in time of war, by death or such other punishment as a court-martial may direct, and if the offense is committed at any other time, by such punishment, other than death, as a court-martial may direct."

The difference in the gravamen of the offense proscribed by Article 92, and the one condemned by Article 90, can be gleaned from a reading of the two foregoing Articles. However, the difference is shown more clearly by a comparison of the elements of proof of the offenses and the discussion of each set forth in the Manual. Under the proof necessary to show a violation of Article 90, it must be shown: That the accused received a certain command from a certain officer, that such officer was the superior officer of the accused, and that the accused wilfully disobeyed the command. The discussion in the Manual goes on to state:

> "The willful disobedience contemplated is such as shows an intentional defiance of authority . . .

> ". . . Disobedience of an order . . . which is given for the sole purpose of increasing the penalty for an offense which it is expected the accused may commit, is not punishable under this Article.

> •   •   •   •   •   •

> "The order must be directed to the subordinate personally." [Paragraph 169*b*, Manual for Courts-Martial, United States, 1951.]

On the other hand, the proof necessary to establish a violation of Article 92 requires only: That a certain lawful order was issued by a member of the armed forces, that the accused had knowledge of the order, that it was his duty to obey the order, and that he failed to do so. This is the wording of the discussion pertaining to that offense:

> "This section contemplates all other lawful orders which may be issued by a member of the armed forces, violations of which are not chargeable under Article 90 or Article 91. In order to be guilty of this offense, a person must have had a duty to obey the order and must have had knowledge of the order. Such knowledge may be actual or constructive. Knowledge is 'actual' when it is conveyed directly to the accused. It is 'constructive' when it is shown that the order was so published that the accused would in the ordinary course of events, or by the exercise of ordinary care, have secured knowledge of the order." [Paragraph 171*b*, Manual for Courts-Martial, United States, 1951.]

When the two offenses are compared in the light of the Code and the Manual, it is readily apparent that the difference between them finds its roots in the personalized nature of the transaction. This difference is adequate to distinguish the case at bar and the *Marsh* case. A convening authority may or may not be an accuser depending upon the type of offense he refers to a court-

582

martial. If he insists on charging a subordinate with a personal affront to his dignity, then he colors the proceedings with a personal touch. In the *Marsh* case, unless the plan adopted by the Government envisaged a bona fide wilful violation of a personal order, it would clash head-on with the principle that an order cannot be given for the sole purpose of increasing punishment. There would be no other reason which would prompt the writing of a separate and otherwise unnecessary order. It was not necessary for administrative purposes as another order had authorized the expenditure of funds for travel. Without a personal flavor added to the order, the maximum punishment could not justifiably jump from six months to five years; and if the concept is that a superior officer must be made a party to the transaction to increase the punishment, the one who participates in the act can hardly contend he has no personal interest. Unless the order is so framed as to get out of the routine category, the charge should be laid under Article 92. In that case the convening authority concluded the order was not routine as he referred to the court a violation of Article 90.

In the instant case, no attempt was made to increase the punishment by issuing an unnecessary and unneeded direct order. Allowance cannot be paid without some authorization and it was necessary that some written order be furnished the transportation officer before the journey could be started. While there is language contained in the order given the accused which is irrelevant to the principal purpose, it does not change the travel orders into a direct personal order of General Silverthorn. The procedure herein involved covered only the steps necessary to complete the details of furnishing the accused the authorization to travel. Moreover, at the time the order was read to him, no effort was made to impress upon him the fact that failure to report would constitute wilful disobedience of a personal order, personally given by a superior officer. This record reflects a routine procedure in which a non-personalized order was issued with the prime objective of transporting the accused back to his proper unit and not for the sole purpose of creating an individualistic status which would lay the groundwork for a separate and distinct offense.

In United States v. Gordon, supra, we laid down the rule that if a reasonable person would conclude that the convening authority had a personal interest in the prosecution, he was an accuser and disqualified to convene a court. We see no good reason for departing from that principle; and if we measure both this case and the *Marsh* case by the rule, we arrive at different conclusions. In the latter we had no hesitation in saying that a reasonable person would conclude that General Hodge would have a close personal interest in seeing that enlisted men under his command did not display contempt for his personal orders. Under the plan then in operation, he was the victim of the violation and he would be particularly zealous to maintain respect for and compliance with his personal directions. Here we say without hesitation that General Silverthorn occupied only an impersonal relationship to the prosecution. He had not thrown the weight of his own personal order into the melee and there could be no wilful flaunting of his personal directive. As we have previously announced, there is no necessity for finding personal animosity on the part of the superiors. The crux of this problem is one of human behavior. The ordinary superior is inclined to be prejudiced against one who wilfully disobeys a personal command. In those instances where he is prejudiced, the members of a court-martial are not selected with the same unbiased judgment that would be exercised by an officer entirely uninfluenced by the crime. The potentialities of harm inherent in a system which permits a party to a transaction to appoint a court-martial were of sufficient importance that Congress saw fit to disqualify any officer from convening a court-martial who was an accuser. Congress supplied its own definition of the latter. In the Code we find the following definition:

" 'Accuser' shall be construed to refer to a person who signs and swears to charges, to any person who directs that charges nominally be signed and sworn by another, and to any other person who has an interest other than official interest in the prosecution of the accused."

We feel that in this instance the commanding general had only an official interest in the prosecution. Conceding that in both instances the issuers of the orders were dealing with a class, in the one plan each member of the class was isolated out for preferential and personalized prosecution for an offense arising out of a personal transaction, while in the other the member was subject only to a class directive.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge BROSMAN concur.