UNITED STATES, Appellee

v

JOHN PAUL DOYLE, Lieutenant, U. S. Navy, Appellant

9 USCMA 302, 26 CMR 82

303

*Ensign David Clinard,* USNR, argued the cause for Appellant, Accused.
*Major George M. Lilly,* USMC, argued the cause for Appellee, United
States. With him on the brief were *Lieutenant Colonel Charles H. Beale,
Jr.,* USMC, and *Lieutenant (jg) John V. L. Ellicott,* USNR.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

A general court-martial convicted the accused of larceny, dishonorable failure to account for funds, signing a false official statement, and failure to obey a lawful general order, in violation of Articles 121, 133, 107, and 92, Uniform Code of Military Justice, 10 USC §§ 921, 933, 907, and 892, respectively. The sentence imposed was dismissal, total forfeitures, and confinement at hard labor for five years. The convening authority reduced the period of confinement to two years but otherwise approved the sentence, and the board of review affirmed. This Court granted the accused's petition for review to consider three errors assigned by him.

The first question is whether the convening authority was disqualified to convene the court-martial as a person who had "an interest other than an official interest in the prosecution of the accused." Article 1 (9), Uniform Code of Military Justice, 10 USC § 801. See Article 22(b), Uniform Code of Military Justice, 10 USC § 822. While we are reversing the decision of the board of review on other grounds, we dispose of this question to avoid any issue of pretrial irregularities in the reference of charges being raised if the case is reheard. All of the charges in this case stemmed from the accused's alleged defalcation of funds entrusted to his care as the appointed representative of his Naval unit's participation in a "United

Success" fund-raising drive in the year 1955, sponsored by the Community Chest of San Diego, California. Rear Admiral C. C. Hartman, Commandant of the Eleventh Naval District, in his capacity as Commander, Naval Base, San Diego, accepted the chairmanship of the Military Division of the Drive, and on July 1, 1955, in a letter to the forty-odd Naval units in the Eleventh Naval District, he requested that one officer be appointed in each unit with the responsibility to represent that unit throughout the fund-raising campaign. Captain B. F. Tompkins, Commander, San Diego Group, Pacific Reserve Fleet, complied with the request on August 26, 1955, by designating the accused. In the meantime, on August 23, 1955, Admiral Hartman's Headquarters issued certain written instructions concerning the campaign and found therein is the following: "All contributions [to the United Success Drive by Naval personnel within the entire command] shall be forwarded by *individual* ships and commands *directly* to United Success Drive Headquarters, P. O. Box 2671, San Diego 12, California." On November 14, 1955, the accused addressed a letter to Captain Tompkins reporting that he had received contributions totaling $1,669.32. This information was relayed to the Fund Headquarters, for on January 26, 1956, Admiral Hartman received a letter from the General Manager of the Drive notifying him

the records of that organization did not reflect the receipt of any such sum from the San Diego Reserve Fleet group and that he had consulted the accused, who acknowledged the amount of the collection but asserted the sum had been forwarded to the Community Chest in the form of postal money orders. Pursuant to this communication and other conflicting reports, Admiral Hartman, on February 8, 1956, directed Captain Tompkins to initiate such investigative action as he deemed appropriate. As the result of the investigation, the accused was charged subsequently with the offenses which are the subject of the present appeal.

Before accepting the accused's plea, the law officer entertained a motion by defense counsel to withdraw the charges from the court. Defense counsel's grounds may be grouped into two general categories. First, he notes the accused had been charged, inter alia, with "failing to forward contributions of personnel of the San Diego Group, Pacific Reserve Fleet, for the United Success Drive, Community Chest of San Diego, California, in the prescribed manner." He argues that Admiral Hartman was disqualified as a convening authority in this case because it was his order the accused had violated, citing United States v Marsh, 3 USCMA 48, 11 CMR 48. This contention is well made only if the appointing authority was so closely connected to the offense upon which this accused was arraigned that a reasonable person would conclude he had a personal interest in the outcome of the litigation. United States v Gordon, 1 USCMA 255, 2 CMR 161. In the Marsh case, supra, the convening authority was disqualified to convene the court to try the charge of the accused's willful disobedience of an order of a superior officer, in violation of Article 90, Uniform Code of Military Justice, 10 USC § 890. Reliance upon that case is misplaced in this instance. The convening authority in Marsh was disqualified because, under the circumstances of that case, the order was deemed to have been issued by the convening authority directly to the accused, and it was reasonable to impute to the

former "a personal interest in seeing his orders were obeyed." The order of the convening authority in this case, on the other hand, cannot be construed as a personalized order of a superior officer to a subordinate; nor was it charged as such, but rather as the violation of a lawful general order. In fact, the chronology of events conclusively demonstrates the order was not a direct, personal order of Admiral Hartman to the accused, for if it applied to any persons, it applied to a class, and it was already existent before the accused came within its purview. Such factors are sufficient to distinguish this case from United States v Marsh, supra. In United States v Keith, 3 USCMA 579, 13 CMR 135, the following distinctions were precisely drawn:

"In United States v Gordon, supra, we laid down the rule that if a reasonable person would conclude that the convening authority had a personal interest in the prosecution, he was an accuser and disqualified to convene a court. We see no good reason for departing from that principle; and if we measure both this case and the Marsh case by the rule, we arrive at different conclusions. In the latter we had no hesitation in saying that a reasonable person would conclude that . . . [the convening authority] would have a close personal interest in seeing that enlisted men under his command did not display contempt for his personal orders. Under the plan then in operation, he was the victim of the violation and he would be particularly zealous to maintain respect for and compliance with his personal directions. Here we say without hesitation that . . . [the convening authority] occupied only an impersonal relationship to the prosecution. He had not thrown the weight of his own personal order into the melee and there could be no wilful flaunting of his personal directive. As we have previously announced, there is no necessity for finding personal animosity on the part of the superiors. The crux of this problem is one of human behavior. The ordinary superior is inclined to be prejudiced against one who wil-

fully disobeys a personal command. In those instances where he is prejudiced, the members of a court-martial are not selected with the same unbiased judgment that would be exercised by an officer entirely uninfluenced by the crime. The potentialities of harm inherent in a system which permits a party to a transaction to appoint a court-martial were of sufficient importance that Congress saw fit to disqualify any officer from convening a court-martial who was an accuser."

That rationale is decisive here. See also United States v Noonan, 4 USCMA 297, 15 CMR 297; United States v Teel, 4 USCMA 39, 15 CMR 39.

Appellate defense counsel next asserts that Admiral Hartman was disqualified as to all charges because his interest in the Drive was tantamount to his having had a personal interest in the prosecution of the accused. Such a characterization of Admiral Hartman's activities fails to discriminate properly between personal and official interest. There is ample evidence that Admiral Hartman lent his full support to the charitable enterprise. He issued instructions for organizing the Drive in units of his command, made appearances and speeches at rallies, issued notices and letters upon the subject, made members of his staff available for campaign work, and assisted in other ways. However, there is nothing in the record before us which demonstrates he took anything but an official interest in a project to raise funds within the military units under his command for the civilian charities of the community of which they were a part. In his letter of July 1, 1955, he announced his acceptance of chairmanship duties was "predicated on his belief that full military support of this campaign is vital not only to the community but to the military." True, he performed his duties in an energetic manner, but that is to his credit as a commander. In loose terminology, one might say he had an interest in the conduct of all Naval personnel who were participating in the Drive, but that would only be the interest of any commander that his subordinates conduct themselves in such a manner as not to bring discredit on the service. In that connection, we see a legal difference between a devotion to duty and a personal interest in the outcome of criminal prosecution. The accused's conduct arising out of the alleged misappropriation of funds entrusted to him caused the Admiral no financial or personal loss. No doubt he encountered the normal embarrassment any commander experiences who is presented with facts indicating that an officer of his command may have publicly disgraced the military service. He, however, did not select the officer, and his judgment was in no way being measured. He expressed no prejudgment of accused's guilt when he was apprised of discrepancies between reported and remitted funds collected by the accused. On the contrary, he stated it appeared there was some question about whether proper accountability measures were employed by the custodian of those funds. At that time he only directed that Captain Tompkins initiate an investigation and make recommendations, if called for, as to proper disciplinary action. Taking those preliminary steps does not constitute the Admiral an accuser, for paragraph 5a(4), Manual for Courts-Martial, United States, 1951, specifically exempts that situation as follows:

". . . The person who signs and swears to charges is always an accuser. Whether a commander who convened the court is the accuser in other cases is a question of fact. Action by a commander which is merely official and in the strict line of duty cannot be regarded as sufficient to disqualify him. For example, a commander may, without becoming the accuser in the case, direct a subordinate to investigate an alleged offense with a view to formulating and preferring appropriate charges if the facts disclosed by such investigation should warrant preferring charges. The commander may thereafter refer such charges for trial as in other cases."

The second question involves the admissibility of the testimony given by

Captain Tompkins, accused's commanding officer. As a subsidiary question, we deem it necessary to consider the admissibility of the testimony of Lieutenant (jg) Corbett. Both witnesses interrogated the accused about the failure to account, and neither gave him the warning required under Article 31, Uniform Code of Military Justice, 10 USC § 831. While our grant did not specifically mention the questioned testimony given by Lieutenant Corbett, it obviously becomes relevant to the question of prejudice to the accused if Captain Tompkins' testimony was improperly admitted. Certainly, if the evidence furnished by the Lieutenant is inadmissible, the prejudicial effect of other incompetent evidence would be increased. We will, therefore, discuss fully the admissibility of the testimony of both witnesses.

Unfortunately, the record does not reflect with accuracy the exact chronological order of events. But, from the facts and circumstances and the subjects discussed, it is possible to show with a degree of certainty the sequence of the disclosures made by the accused. The major portion of the uncertainty arises because Captain Tompkins did not fix the time of his first interrogation of the accused. He testified that he believed it to be sometime in the latter part of December, and we use that approximate time even though the dissenting member of a board of review found from his reading of the record that the interrogation was after Captain Tompkins had been directed to order an inquiry, which was in February 1956.

On August 26, 1955, the accused was appointed the campaign representative for his unit by Captain Tompkins. On November 14, 1955, he forwarded to Captain Tompkins a letter showing that he had received $1,669.32. On December 20, 1955, Admiral Hartman forwarded a letter to Captain Tompkins' Headquarters, showing a contribution of $1,760.00 from the San Diego Group, Pacific Reserve Fleet. Prior thereto the Captain had had several conversations with the accused, and in these the accused explained his method of operation, which consisted of holding the individual contributions until they totaled $100.00 or more and then transmitting the collected amount to the United Success Fund Drive Headquarters. In the latter part of December, Captain Tompkins received information that the Drive had not received any funds from his organization. He thereupon directed the accused to report to him, and the accused complied with the order. Prior to the interrogation, the Captain did not advise the accused fully of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, but he did state in substance that anything the accused said might be held against him in a court-martial trial if one were later held. In the conversation, the accused admitted receiving the money and informed the Captain his collections had been remitted to Fund Headquarters by Post Office money orders. The Captain then directed the accused to produce the receipts, and the latter stated they were at his home. He was then ordered to produce them for inspection. The accused on the following morning returned with certain retained stubs, and they were examined by the Captain and the Chief of Staff. As it turned out, they did not support the accused's previous contention.

Briefly summarized, the testimony of Lieutenant (jg) Corbett was as follows: She took an active part in seeking to track down the missing funds as she had been appointed treasurer for the District Headquarters in the United Success Drive. Sometime early in January 1956, she was informed that the contributions reportedly received from Tompkins' unit had not arrived. She contacted the accused by telephone, but apparently he delayed furnishing any information by asserting he was too busy to discuss the subject. He, however, agreed to return her call within two or three days. Not having heard from him during that period, she again called him on the telephone. At that time, he stated he had either lost or misplaced his record of receipts. He informed her of having collected $1,760.00 and stated he had forwarded two money orders which on their faces totaled that amount. Because of the vagueness of his answers, she suggested he contact a Mr. Chandler of the Fund for an ap-

**307**

pointment to clear up the discrepancies. A short time later, she was informed by Mr. Chandler the accused had failed to keep his appointment, and she thereupon called the Fleet Administrative Officer and explained the situation. She was assured the accused would appear for his next appointment. Some short time thereafter, the Headquarters received a letter from the accused which listed certain detailed information, and she checked it against the letter of transmittal previously furnished by him. On January 27, 1956, she again called the accused and requested the receipt numbers of his money orders. He stated they were at home but he would call her on Monday morning and furnish the desired information. When she failed to receive the promised call, she again telephoned the accused and obtained from him the serial numbers of seventeen money order receipts which he claimed were made payable to the Fund. Within the next day or two, she, accompanied by a Naval Ensign, called on the accused for the purpose of checking the receipt numbers against the stubs retained by him. She confronted the accused with the list of receipt numbers he had given over the phone, but verification was impossible for the reason that the accused stated he was mistaken about his having possession of the receipts. He said they had disappeared and that the numbers were given from memory. When questioned as to how he could remember seventeen numbers, he explained that on each occasion when he had purchased a money order for the Drive, he had also obtained a money order to pay his personal bills; that because they were purchased at the same time, the numbers varied only by one digit; that he had retained stubs for his own remittances; and that the retained stubs had been used to refresh his memory. The day after this last conversation, the accused was interrogated by an investigator from the Office of Naval Investigations at Captain Tompkins' behest; but, in the meantime, Lieutenant Corbett, in cooperation with other Naval officers, had conferred with postal officials about the purchases of the alleged orders.

When the Government sought to in-troduce the testimony of Captain Tompkins, trial defense counsel objected on the basis of the failure of the Captain to advise accused of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. Because the Captain had testified he did not suspect the accused of an offense, the law officer summarily overruled the objection. Trial counsel sensed a possibility of error, and he thereupon moved to strike the testimony which encompassed the accused's admissions. The law officer failed to give fair consideration to trial counsel's judgment or the importance of the issue, for in ruling on the motion he stated: "I feel it is already in the record. It has been ruled upon. It was submitted. . . . The law officer ruled upon it and presented it to the court. It is too late to backtrack, if there was an error it has been committed."

The law officer acted similarly when the prosecution offered the evidence of Lieutenant (jg) Corbett. The defense objected to her testimony upon the ground of a failure to warn and requested permission to examine the witness on her suspicion of the accused. This request was denied and the objection overruled. Particularly important to this issue is the following evidence furnished by her on cross-examination:

"Q. At the time, then, you had this conversation with the accused which I believe you testified started in the first week of January?

"A. Yes, the telephone conversation.

"Q. You were aware of the fact that he had violated that order, were you not?

"A. Yes, I was.

"Q. Therefore, he was suspected of a violation of an order, was he not, in your own mind?

"A. No, I wouldn't—

"Q. To your knowledge, to your own testimony, Miss Corbett, he had violated an order from your own observation and your own knowledge?

"A. Yes, he had.

"Q. He was suspected then, was he not; he had violated the order?

"A. Yes.

"Q. Then refreshing your recollec-

tion in this fashion, at the time that you had your first conversation with Mr. Doyle he was suspected of violating an order?

"A. That's correct."

This testimony may be contradictory to Lieutenant Corbett's prior testimony that she did not suspect the accused of any offense, a matter which will be discussed more fully later. However, that was not the basis for the law officer's ruling, as his reason for overruling the objection was bottomed on his opinion that the Lieutenant's efforts were no more than an administrative effort to track down what appeared to be a mix-up in the transmission of certain funds.

After conviction and sentence, the record was reviewed by a staff legal officer of the Commandant, Eleventh Naval District. Errors in the admission of testimony were considered collectively by him, but he concluded that all rulings were correct. When the case reached the board of review, all members agreed the accused was not warned adequately by the interrogating parties, but a majority of the board concluded he was not entitled to be warned for the reason that neither of the interrogators suspected him of an offense. The dissenting member of the board concluded that, at least so far as Captain Tompkins was concerned, the facts and circumstances found in the record preponderated in favor of a holding that he did suspect the accused and that the admission of the incompetent testimony was prejudicial. This member, however, concluded that his finding of a violation of Article 31 by the Captain did not require him to consider the effect of the same dereliction on the part of Lieutenant (jg) Corbett.

In disposing of this issue, it is clear beyond cavil that the accused was not warned by either officer in accordance with the requirements of Article 31. Accordingly, the first proposition which must be considered is whether they suspected him of an offense at the time of the interrogations. At times, in our holdings on cases, we have concluded that testimony offered in support of an accused was incredible. A similar prob-

lem confronts us in the case at bar. Either the two officers misunderstood what is meant by the phrase "suspected of an offense" or their testimony must be characterized as impossible of belief. Trial defense counsel did not examine the witnesses on their understanding of the words, but they must have been using a yardstick unknown to us, for we cannot believe this intensive course of investigation with its many ramifications could start and proceed to the employment of an Office of Naval Investigations special investigator with the first two important interrogators not suspecting irregularities on the part of the accused.

In the case of Lieutenant (jg) Corbett, we encounter no difficulty at all, for her testimony is to the effect that she suspected the accused of having violated Article 92. Trial counsel sought to avoid the legal import of this testimony by contending that a very astute examiner had talked the girl into saying something she did not mean. It may well be she did not have Article 92 of the Code in mind when she first telephoned the accused, but she certainly knew the Admiral had issued instructions which had been violated by him. Rather than stating something she did not mean, we are impressed with the fact the Lieutenant well knew the accused had become the custodian of funds and he had not accounted for their disposition as ordered by the Admiral. We, of course, do not know whether the Lieutenant knew the essential elements of all of the offenses which are based on the various aspects of accounting for funds, but we conclude she knew there were irregularities in accused's accounts. Her first contact with him was some six weeks after he had reported the receipt of $1,670.00; she knew the Fund Headquarters had no account of those funds; and she was specifically required to ascertain the reasons for their nonreceipt. Perhaps when she first called the accused, she may have believed he could account for their failure to reach Drive Headquarters, but certainly, before she had proceeded very far with her task of investigating—even to the extent of checking the money order numbers with the Post Office—she

must have suspected accused of some wrongdoing. She testified the accused was evasive, he failed to keep appointments, he first told her the money had been remitted by only two money orders, and he subsequently informed her he had furnished the money by seventeen. When pressed for production of the stubs, he informed her he had made a mistake and he did not have them in his possession, and he then related to her a story of remembering by an association of numbers with those on his personal money orders. One could hardly read her testimony and accept her conclusion that she never suspected the accused of any offense unless suspicion means to her proof beyond all doubt. At times in her work she was assisted by two other Naval officers, and her whole course of conduct would do justice to a detective. However, in fairness to the witness, it may well be that she understood her suspicions of larceny had to be fixed at the time of the first telephone conversation. Again, it may be that she concluded an administrative determination had been ordered and her individual beliefs were unimportant as she was carrying out orders of her superiors. But neither of those reasons would insulate her from the requirement to warn when she did suspect irregularities on the part of the accused. As we understand Article 31, it is applicable when any interrogator subject to the Code first suspects a person of an offense. In this instance, if Lieutenant Corbett's suspicions were not aroused at the time of her first conversation with the accused, but later she had reasons to believe otherwise, then the duty to warn him of his rights arose as soon as doubt crept in. When that concept is considered, it is not possible for us to believe that the Lieutenant did not suspect the accused was not explaining reasonably his disposition of the funds.

We view the testimony of Captain Tompkins in substantially the same light. Here again, it may be that the officer did not understand properly the phrase "suspicion of an offense." In the middle of November, he had received a letter from the accused showing the receipt of $1,670.00. He had been notified by the accused that the money was being remitted in sums of $100.00, and he must have concluded that if that was the method of operation, some sixteen or seventeen money orders would have been mailed to Drive Headquarters. Some six weeks later, he was informed by the Chief of Staff that the Headquarters had not received any money from the accused, and that would mean a number of remittances had not reached their destination. We are certain that when the Captain was informed of the fact that over the entire campaign period no money had been received, a cloud of suspicion settled over the head of the accused. We are fortified in that belief by the fact he saw fit to advise the accused partially of his rights. At least, he did go so far as to inform him that anything he said might be used against him if he were court-martialed. That hardly bespeaks a belief of innocence, nor in this instance do the facts indicate the Captain gave the warning out of a superabundance of caution. Moreover, when he received the information, he ordered the accused to report; he interrogated him about the disposition of the funds; he directed production of the receipts which the accused had said were in his possession; and he and the Chief of Staff checked and found the receipts furnished by the accused totaled a sum far short of the amount collected—a rather summary high level investigation of an officer who we are asked to believe was not suspected of improperly handling trust funds. No doubt, had he been examined as to his understanding of law imposing penal sanctions on a custodian of funds who fails to account, a different belief might have been expressed by the Captain. If he was apprised of the law to that effect, then his failure to suspect is simply unexplainable. Certainly, the failure of even a single money order to reach its destination, when approximately sixteen should have been forwarded, could not be overlooked by some belief that the mail had not been delivered. Nor could it be believed reasonably that all sixteen would have been improperly credited to the wrong contributors. In short, we believe the Captain, upon receiving information that in six weeks time no contributions had

310

been received by Fund Headquarters and that the matter had been called to the attention of the Chief of Staff, could not but have suspected this accused of some sort of offense.

For the foregoing reasons, we conclude that both Captain Tompkins and Lieutenant (jg) Corbett were legally bound to advise the accused completely and properly before interrogating him fully about his accounts. They failed to do so, and the law officer committed error when he overruled the defense's objection. That brings us to the question of prejudice.

In dealing with prejudice, it could be treated in two ways. First, we might expand our issues to include the question of the admissibility of the testimony of Lieutenant (jg) Corbett and permit counsel for the parties to argue that issue. However, we need not do that in this instance, for in determining the prejudicial impact of the testimony of Captain Tompkins, we measure its effect in the light of the competent and relevant testimony of record. We have already shown that the testimony of Lieutenant (jg) Corbett was incompetent, and she furnished a very substantial part of the evidence touching on accused's guilt. Without that testimony to rely on, the Government's case is substantially weakened, and the evidence of Captain Tompkins assumes importance. It showed that the accused received a substantial sum of money; that he claimed to have possessed records showing the purchase of that sum in money orders; that he was unable to produce the receipts; that those furnished were inconsistent with his claim he had remitted the money in $100.00 lots; and that his story to the Captain was inconsistent with other versions given by him. In summation, the evidence given by Captain Tompkins painted the accused as a person who had obtained funds and inconsistently sought to explain their lawful distribution. Testimony of that character could not help but have a very devastating effect on the probability of accused's guilt. We, therefore, find substantial prejudice.

In view of the fact that this case may be retried, we mention briefly the fact that there are grave doubts about the legality of the findings of guilt on the specification of Charge I, which alleges a violation of a lawful general order, contrary to Article 92, supra; Charge II and the specification thereof, which alleges a false official statement proscribed by Article 107, supra; and the specification of Charge IV, which charges a failure to account for contributions under Article 133 of the Code, supra. As to the first charge, the nature and content of the instructions issued by Admiral Hartman are such as to raise serious doubt about the letter being a military order and its violation a military offense. Regarding the specification of Charge II, previous decisions of this Court suggest a lack of officiality in the statement. In connection with Charge IV, it appears to allege an offense consisting only of one of the elements necessary to support a finding of larceny under a theory of embezzlement. Without belaboring this opinion with an extended discussion on those questions, we believe that, in the interests of justice, if the accused is given another hearing he should be tried only on the offense of larceny. That will avoid any question of multiplicity and other legal pitfalls which might otherwise be encountered on a second appeal.

The decision of the board of review is reversed, and the record is returned to The Judge Advocate General of the Navy for disposition not inconsistent with this opinion. A rehearing on larceny may be ordered.

Judge FERGUSON concurs in the result.

QUINN, Chief Judge (dissenting):

I disagree with the principal opinion in regard to the admissibility of the testimony of Captain Tompkins and Lieutenant Corbett. In my opinion, there is sufficient evidence to support the law officer's ruling that the testimony of both witnesses was not obtained in violation of Article 31 of the Uniform Code, 10 USC § 831.

Captain Tompkins testified he was advised by his Chief of Staff that the

Community Chest had not received the contributions collected from the personnel of the Pacific Reserve Fleet Group. He called the accused, who was responsible for collection and remission of the contributions, to his cabin. When the accused appeared, he told him he had "a report that the money had not been turned in to the Community Chest." While he "quoted . . . [no] article" from the Uniform Code, he advised the accused that "anything he said might be held against him in a trial or court, if there were one." He also "believe[d]" he informed the accused "that he did not have to make a statement." On this evidence, the law officer overruled defense counsel's objection to testimony regarding the content of the conversations between the accused and Captain Tompkins. Since the evidence shows compliance with Article 31, the ruling is correct. United States v Davis, 8 USCMA 196, 24 CMR 6.

Lieutenant Corbett testified she acted as Treasurer for the United Success Drive at District Headquarters. Mr. Chandler, one of the officials of the Community Chest, telephoned her and requested her assistance in locating contributions from the Reserve Fleet Group, which had been reported as collected but apparently not received by the Chest. As a result, she communicated with the accused. Later, she had several conversations with him. She testified that in her dealings with the accused she did not suspect him "of any crime." However, on cross-examination she admitted, in response to leading questions by defense counsel, that she "suspected" the accused had violated an order from the Commandant, Eleventh Naval District, requiring that contributions be forwarded by a letter of transmittal.

Although Lieutenant Corbett may have "suspected" the accused of violating an order, the evidence unmistakably shows that her entire relationship with him was directed to locating the funds which he had purportedly forwarded to the Chest. Her initial contact with the accused resulted from a routine call of a civilian employee of the Chest, who did not himself at that time entertain any suspicion of wrongdoing. Lieutenant Corbett was not connected with law enforcement. Her testimony indicates she had no reason to, and did not in fact, suspect the accused had not transmitted the contributions which earlier he had officially reported he had collected. In ruling on defense counsel's objection to the Lieutenant's testimony on the ground that it was obtained in violation of Article 31, the law officer said that it was his "opinion . . . that from the evidence in this case at this time, it was an Administrative effort to track down what appeared to be a mix-up in the transmission of certain funds in connection with the United Success Drive." The ruling has substantial foundation in the evidence and cannot, therefore, be set aside as incorrect as a matter of law. United States v Davis, supra; United States v Dickenson, 6 USCMA 438, 20 CMR 154.

I would affirm the findings of guilty of larceny under Charge III. However, in other respects I agree generally with the principal opinion, including its reservations as to the legality of the findings of guilty on Charges I, II, and IV.