UNITED STATES, Appellee,

v.

Vernon W. CROSSLEY, Staff Sergeant,
U. S. Marine Corps, Appellant.

No. 38,402.
NCM 79 0176.

U. S. Court of Military Appeals.

· April 13, 1981.

For Appellant: *Lieutenant Commander Lawrence W. Muschamp*, JAGC, USN (argued).

For Appellee: *Lieutenant J. G. Van Winkle*, JAGC, USNR (argued); *Commander T. C. Watson, Jr.*, JAGC, USN (on brief).

Opinion

FLETCHER, Judge:

At his special court-martial with members, the appellant was found guilty of conspiracy to disobey an order and disobeying an order, in violation of Articles 81 and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 891, respectively. After a finding of guilty the Marine Corps court members sentenced him to a bad-conduct discharge, confinement at hard labor for 6 months, forfeiture of $200.00 pay per month for 6 months, and reduction to the grade of E–3. The convening authority approved the findings, but suspended the confinement at hard labor in excess of 3 months. The United States Navy Court of Military Review disapproved the bad-conduct dis-

charge as a matter of sentence appropriateness. We granted the issue to consider whether Major General Fleming, the convening authority, was disqualified from taking the post-trial action in the appellant's case. We are compelled to answer this question in the affirmative and to direct the appointment of another general court-martial authority to perform these post-trial functions.

An examination of the factual setting of this appeal is central to our jural resolution of the legal issue presented. Rapid breakdown of morale in a Marine Drum and Bugle Corps led to the calculated refusal of its members to respond to a motion to play at a minor ceremony in Jackson Square, New Orleans. Major General Fleming, presiding at the ceremony where this so-called "no-blow" took place, had previously engaged in a vigorous attempt to prevent the Drum and Bugle Corps from being transferred to Twenty-Nine Palms, California, under an economy measure. By personal intervention with the Commandant of the Marine Corps and by at least two letters, he forcefully pleaded for retention of the unit because of the interest it generated in potential new enlistees and its utility in providing ceremonial music for dignitaries. In his words, "you can take away my gusto, but don't take away my" Drum and Bugle Corps. In this effort, Major General Fleming was initially successful; the Commandant reversed his initial transfer decision. However, on the very day of the incident, a laconic naval message was received: "The ref [the earlier reversal of the move decision] is cancelled."

There is evidence of record that the General reacted strongly to the failure of the Drum and Bugle Corps to play. Corporal Multen testified that while driving the General away from the ceremony, he heard him comment "that he had never seen anything like that before." There followed in the General's office a period of intense activity. Several civilians called on the telephone requesting information and an unusual number of officers met with Major General Fleming. Major Cutlip described a meeting with the General, thus: "His initial appearance to me was one of shock and disbelief, this being at the first ... my first meeting with him on that day."

Sergeant Lampley, a member of the Drum and Bugle Corps had described a meeting of the members with Major General Fleming after the incident. He told them that "because he had put his neck on the line to keep the drum and bugle corps" in New Orleans, he was disturbed, "disappointed and ashamed of what had happened." Sergeant Lampley testified (although this was contested by other testimony) that the General told them that the amount of punishment they received "would depend on ... how much the news media" came to know "about the incident." Thereafter, he extracted individual promises from each member that he would not fail to play at three upcoming performances. According to one account of the convening authority's words to them, they "would be playing for [their] lives."

Extensive negative publicity did result from the "no-blow" incident involving the Drum and Bugle Corps, as is shown by a number of news reports appearing as appellate exhibits in the record of trial. Approximately 26 members of the Drum and Bugle Corps were ultimately disciplined for the incident. More severe discipline was imposed on those of higher rank who did not exercise needed leadership.

Recently, in *United States v. Conn*, 6 M.J. 351 (C.M.A.1979), the majority of this Court addressed, *inter alia*, the legal issue granted in the instant case. Considering whether the convening authority was disqualified from referring charges and whether he was disqualified from the post-trial review, we held that the facts supported the conclusion that the convening authority's involvement was merely official. The facts demonstrated that the convening authority held briefings, read witness statements, conferred with the Staff Judge Advocate and the trial counsel, directed the accused's immediate arrest, ordered a helicopter to accomplish the same, and prevented the appellant's release from pretrial confinement. *Id.* at 354.

Furthermore, *United States v. Conn, supra,* examined the post-trial review disqualification issue we consider here and concluded he was qualified for two reasons: (1) His involvement was only official, not personal; and (2) "no clear predisposition by the convening authority as to the salient issue is clearly indicated in the record of trial." *Id.* at 354–55.

But the legal question we are here called upon to answer arose in the first term of this Court in *United States v. Gordon,* 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952). There an accused was convicted of the burglary of one General's house and the attempted burglary of another—the occupant of the latter was the convening authority referring the charges and approving the results of the general court-martial. The second charge of attempted burglary was subsequently dismissed and the accused was tried and convicted of the first offense. Under Article of War 8, the Court held that the convening authority was an "accuser" and thus disqualified to appoint the court. The Court further held that "the right to an impartial review is an important right which must be recognized in the military judicial system and an accused is entitled to have the record reviewed and the limits of his sentence fixed by one who is free from any connection with the controversy." *Id.* at 262, 2 C.M.R. at 168. This is the standard which compels us to rule that Major General Fleming was disqualified to perform the post-trial review function in this case.

Not unlike our ruling under the facts in *Brookins v. Cullins,* 23 U.S.C.M.A. 216, 49 C.M.R. 5 (1974), we do not base our decision in this case merely on the convening authority's presence at the locus of the crime. The true test of a convening authority's disqualification to refer charges or to perform post-trial review continues to be "whether, upon the particular facts and circumstances . . . a reasonable person would impute to him a personal feeling or interest in the outcome of the litigation." *United States v. Gordon, supra* at 260, 2 C.M.R. at 166.

We do not attempt here to psychologize the mind of the convening authority nor should this opinion be read as a criticism of this convening authority's animus or decision-making. We only perceive a reasonable probability that his review of the matter reflected personal interest. *Cf. United States v. Conn, supra.* We reiterate merely that "[c]onvening [authorities] should remember that there are easy and adequate means to have" reviewing functions performed by an authority with no personal feeling in the outcome of the litigation. *United States v. Gordon, supra* at 261, 2 C.M.R. at 167.

As that opinion further stated:

The reviewing authority is vested with great power over the proceedings of a court-martial. He is at liberty to approve or disapprove the finding of guilty or to approve only so much of a finding of guilty of a particular offense as involves a finding of guilty of the lesser included offense, and he has the power to approve or disapprove the whole or any part of a sentence. Such power should not be vested in a person who is interested in the litigation.

*Id.* at 261–62, 2 C.M.R. at 168.

It need not detain us here that the law of *United States v. Gordon, supra,* arose in the context of a challenge to the commander's disqualification both to refer the charges to court-martial and his disqualification to perform the necessary post-trial review functions. While both issues were challenged in *Gordon* and its progeny, the connection is factually accidental and unnecessary for the instant successful assertion of error.

We do not enter into a debate here over whether the referral of these charges by Colonel Rapp was a surrogate referral on behalf of an accuser-in-fact, the convening authority. We merely are compelled to apply the *Gordon* standard to the qualification of *this* convening authority to exercise post-trial review functions. Under the facts presented, we perceive a reasonable probability that this convening authority was

personally interested in the outcome of the litigation.

The decision of the United States Navy Court of Military Review is reversed. The action of the convening authority is set aside. The record of trial is returned to the Judge Advocate General of the Navy for submission to a different general court-martial convening authority for a new review and action.

EVERETT, Chief Judge (concurring):

Among the most vehement complaints against military justice are those which concern the role of the military commander, who has the responsibility for maintaining discipline and yet appoints the court-martial members and reviews the findings and sentence. Congress has made the determination that in this situation a commander may "carry water on both shoulders." At the same time, however, by providing that an "accuser" may not convene a special or general court-martial, see Articles 1(9), 22(b), 23(b), Uniform Code of Military Justice, 10 U.S.C. §§ 801(9), 822(b), 823(b), respectively, Congress revealed its intention that, in a case where observers might reasonably conclude that a commander had more than a purely official involvement, he should turn over his responsibilities to a superior commander.

Some judicial interpretations of "accuser" may seem rather extreme. For example, in *United States v. Marsh*, 3 U.S.C.M.A. 48, 11 C.M.R. 48 (1953), a lieutenant general was deemed to be an "accuser" and therefore · disqualified to convene a court-martial to try charges that a private had willfully disobeyed travel orders issued by command of the general. Fortunately, the impact of this holding was reduced by later cases which distinguished willful disobedience

from failure to obey. *United States v. Teel*, 4 U.S.C.M.A. 39, 15 C.M.R. 39 (1954); *United States v. Keith*, 3 U.S.C.M.A. 579, 13 C.M.R. 135 (1953). However, the Court remained aware that to give a narrow interpretation to "accuser" would fan the criticism of the broad responsibilities Congress has assigned to military commanders.

In the case at bar, the appellant's flouting of the authority of Major General Fleming was much greater than the disrespect the accused displayed in *Marsh* for the authority of Lieutenant General Hodge. Indeed, the appellant and his fellow members of the Drum and Bugle Corps were involved in conduct perilously close to mutiny[1] —among the most flagrant of military offenses. See Article 94, UCMJ, 10 U.S.C. § 894. Moreover, General Fleming had only a small number of Marines in his command; personal contact occurred between the general and appellant before and after the incident; the general was personally present when the acts occurred which flouted his authority; and the subject matter was one as to which he had a special and personal interest. Under these circumstances—without in any way impugning the motives of this particular commander—I conclude that the results of his post-trial review of the case would inevitably be suspect. There is no need to permit this suspicion to attach.

The only issue before us concerns the post-trial review by the commander, rather than the referral of the charges in the first place.[2] However, when the case is reviewed by a different convening authority upon remand, it seems appropriate that the Staff Judge Advocate inquire in some detail into whether this convening authority should have referred the charges and appointed the members.[3]

---

1. It has been suggested that General Fleming acted with impartiality—indeed, compassion— by not preferring the most serious charges available against Crossley and his co-actors. Even so, in my view, this is insufficient to negate the "personal" rather than purely "official" interest in this unique situation.

2. The petition for grant of review was acted on before I came on the Bench.

3. The orders of July 25, 1978, appointing the special court-martial members, were issued over General Fleming's signature as were several amending orders (dated August 7, 18, and 22, as well as four dated August 24). On August 2, 1978, the case was referred to the court-martial convened by "my convening order" of July 25, 1978, but the reference to trial on the charge sheet was signed by Colonel J. M. Rapp,

Obviously it is inconvenient when a case is transferred to another command for review of a conviction—or earlier for the appointment of court members and the referring of charges to trial. However, in most instances the difficulties of transferring the case to some other coordinate command or to a higher echelon of command do not appear overwhelming. Taking such action in borderline cases will blunt at the outset some of the most serious potential criticisms of the military justice system.

COOK, Judge (dissenting):

I must dissent from the principal opinion. As I view the record, the convening authority was present when the drum and bugle corps refused to play during a scheduled ceremony. In *Brookins v. Cullins*, 23 U.S.C. M.A. 216, 49 C.M.R. 5 (1974), the Court, while holding that the convening authority there was disqualified, specifically noted that the holding was not based on the convening authority's presence during a riot in which the accused participated. Rather, the Court observed that the officer involved had been the object of disrespectful language, he had given various assurances to the competing groups, and he was extensively briefed on the subsequent investigation. Standing alone, even a briefing on the investigation is insufficient to disqualify a convening authority. As *United States v. Conn*, 6 M.J. 351 (C.M.A.1979), makes clear, the performance of official duties to include ordering the investigation, being briefed on an investigation, reading the witnesses' statements, conferring with the

staff judge advocate and trial counsel, directing the arrest of an accused, and ordering a helicopter to effect the arrest do not disqualify a convening authority where he merely performs his official duties. *Brookins*, however, involved a situation where the convening authority intervened in a manner not required by his position.

Although the majority note that a witness testified that the convening authority remarked that the punishment involved would be directly proportional to the amount of news media coverage received, this testimony was contradicted by other witnesses. Accordingly, this factor should not be considered in our analysis of the issue. *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976). The convening authority did take corrective measures to insure that the incident was not repeated and the individuals involved would play during subsequent performances. However, there is nothing to indicate that his conduct exceeded that which would have been expected of any commanding officer. In my opinion, the convening authority did not exceed the scope of his official duties. The principal opinion relies on the fact that the incident resulted · in extensive negative publicity. However, this resulted from the magnitude of the misconduct rather than the convening authority's actions. While the conduct may have been serious, the nature of the offense did not disqualify the commanding officer, who acted only in an official manner in responding to the incident. I would, therefore, affirm the decision of the United States Navy Court of Military Review.

whose name had apparently been typed in over General Fleming's. Colonel Rapp's position is

not explained in the record, but his participation does not call for a difference in outcome.