UNITED STATES, Appellee,

v.

Orlando C. JONES, Sergeant,
U.S. Army, Appellant.

No. 97–0723.
Crim.App. No. 9501462.

U.S. Court of Appeals for
the Armed Forces.

Argued June 2, 1998.

Decided Sept. 29, 1999.

CRAWFORD, J., delivered the opinion of the Court, in which COX, C.J., and GIERKE and EFFRON, JJ., joined. SULLIVAN, J., filed an opinion concurring in the result.

For Appellant: *Captain Patricia A. Lewis* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Michael L. Walters,* and *Major Leslie A. Nepper* (on brief); *Captain John M. Head.*

For Appellee: *Captain Kelly R. Bailey* (argued); *Colonel Joseph E. Ross, Major Virginia G. Beakes,* and *Captain Chris A. Wendelbo* (on brief); *Captain Robert F. Resnick.*

Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, appellant was convicted by officer and enlisted members of attempted larceny, conspiracy to make a false claim (4 specifications), larceny (4 specifications), false swearing, and soliciting another to make a false claim (5 specifications), in violation of Articles 80, 81, 121, and 134, Uniform Code of Military Justice, 10 USC §§ 880, 881, 921, and 934, respectively. Appellant was sentenced to a bad-conduct discharge, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence, substituting partial forfeitures for total forfeitures. The Court of Criminal Appeals affirmed the findings and sentence. We granted review of the following issues:

I

WHETHER APPELLANT WAS DEPRIVED OF MILITARY DUE PROCESS WHEN THE STAFF JUDGE ADVOCATE THREATENED WITNESSES WITH COURT–MARTIAL IF THEY INVOKED THEIR ARTICLE 31, UCMJ, AND FIFTH AMENDMENT RIGHTS TO REMAIN SILENT.

II

WHETHER THE STAFF JUDGE ADVOCATE EXERCISED UNLAWFUL COMMAND INFLUENCE WHEN HE THREATENED WITNESSES WITH COURT–MARTIAL IF THEY INVOKED THEIR ARTICLE 31, UCMJ, AND FIFTH AMENDMENT RIGHTS TO REMAIN SILENT.

We specified the following issue:

WHETHER THE STAFF JUDGE ADVOCATE'S ACTIONS RESULTED IN IMPERMISSIBLE *SUB ROSA* AGREEMENTS WITH APPELLANT'S CO–CONSPIRATORS AMOUNTING TO *DE FACTO* GRANTS OF IMMUNITY AND, IF SO, WHETHER SUCH ACTIONS MATERIALLY PREJUDICED THE SUBSTANTIAL RIGHTS OF APPELLANT.

We hold that appellant has no standing to challenge the further questioning of the prosecution witnesses after they invoked their Article 31(b), UCMJ, 10 USC § 831(b), and Fifth Amendment rights to remain silent. However, appellant does have standing to raise issues concerning confrontation, cross-examination, and the right to present evidence. On those issues, we hold that there was a *de facto* grant of immunity to the witnesses and that there were no actions which materially prejudiced appellant's substantial rights. Art. 59(a), UCMJ, 10 USC § 859(a).

FACTS

The military judge entered extensive findings of fact and conclusions of law. Appellate Exhibit VIII.

Appellant, a finance clerk, was charged with soliciting servicemembers "to submit false claims to the Finance Office and ... splitting the proceeds." During the investigation, A, B, and C, who played small roles in the crimes, were contacted by investigators from the Criminal Investigation Command

(CID). They made statements implicating themselves and appellant.

Later, the Deputy Staff Judge Advocate contacted the Senior Defense Counsel for the National Capital Region for the purpose of obtaining additional counsel to avoid a conflict of interest among the defendants. As part of this conversation, the Deputy Staff Judge Advocate "proposed disposition of the minor offenders" by nonjudicial punishment plus a requirement that they make restitution and give testimony against "the principal offenders." However, there was no agreement as to whether there may or may not be *administrative elimination* after non-judicial punishment. All of this information was given to the senior defense counsel to allow him to assign counsel based on the workload.

There were a number of "subsequent conversations" between the senior defense counsel and the Chief of Military Justice confirming the earlier disposition statements made by the Deputy Staff Judge Advocate.

A and C, with the advice of defense counsel, and B, were offered and accepted, nonjudicial punishment under Article 15, UCMJ, 10 USC § 815, in exchange for their testimony at appellant's court-martial. Defense counsel for A and C "believed formal, written grants of immunity would be forthcoming, and each had advised their clients that the non-judicial punishment did not bar subsequent court-martial action." B, who chose not to be represented by counsel, initially believed that nonjudicial punishment would bar court-martial.

After A, B, and C received nonjudicial punishment, they were questioned by appellant's defense counsel at the Article 32 [1] investigation; each clearly understood that his agreement did not give him absolute immunity from future court-martial. Therefore, they invoked their right to remain silent and did not testify at the Article 32.

Following the refusal of the witnesses to testify at appellant's Article 32 investigative hearing, the Staff Judge Advocate (SJA) telephoned the Regional Defense Counsel (RDC) and expressed concern about the witnesses' failure to cooperate. The SJA told the RDC that he was concerned because the "agreement" that "had been struck with them and their counsel" was that the charges against them would be disposed of at the non-judicial level and, in exchange, A, B, and C would "cooperate with the Government" by "testifying against" appellant. The SJA reminded the RDC that "based on their prior association, his word was good," and told him "that the soldiers would not be subject to further prosecution" if they cooperated. "[B]ut ... if they failed to cooperate, court-martial action [is] likely."

The RDC as the "rater for the defense counsel involved" did not want to "influence his subordinates." He, instead, "explained the concern of the SJA, asked each of the counsel to contact ... the Chief of Military Justice, and to do what was in his or her client's best interest." The Chief of Military Justice, in turn, "conveyed to each ... defense counsel that" there was no grant of immunity, but A, B, and C were nevertheless "expected to testify," and, if they did not, "they could still be court-martialed" on the "substantive offenses for which they had already" received Article 15s.

After A and C were contacted by their respective defense counsel, A and B decided to testify; C was not sure. As they themselves testified, "[n]one of the witnesses have been asked to say anything that they do not believe to be true." At trial, the defense asserted that the actions of the SJA amounted to unlawful command influence and moved for appropriate relief. After a hearing, this motion was denied. While the judge thought that the Chief of Military Justice's statements to defense counsel could "constitute a *de facto* grant of immunity," she declined to make a final ruling unless A, B, and C were prosecuted.

During cross-examination by defense counsel before the members, A, B, and C testified that they had received Article 15 non-judicial punishment but still ran the risk of going to general court-martial depending upon their testimony. They admitted that they invoked their right to remain silent at appellant's

---

1. UCMJ, 10 USC § 832.

Article 32 investigative hearing but decided to testify under threat of court-martial. They also asserted that their testimony at trial was consistent with what they originally told the CID.

The defense argues that in order to convict appellant, the SJA entered into *sub rosa* agreements and *de facto* grants of immunity with the co-conspirators A, B, and C, without the approval—and, apparently, without the knowledge—of the convening authority. Final Brief at 10–12. The defense contends that the "threats" by the SJA violated "basic tenets of military justice." *Id.* at 9. Such conduct, it believes, is outrageous and a violation of due process which should result in a new hearing. *Id.* at 9–10.

In essence, the defense alleges that the SJA violated A, B, and C's rights under Articles 31, 37, and 98, UCMJ, 10 USC §§ 831, 837, and 898, respectively; the Self-Incrimination Clause and Due Process Clause of the Fifth Amendment; and appellant's Sixth Amendment rights by threatening to have A, B, and C court-martialed if they invoked their rights and did not testify in appellant's case pursuant to their agreements. The agreements provided that in exchange for non-judicial punishment and restitution, the individuals would testify truthfully at the court-martial of the principal offenders, including appellant.

The Government asserts, based on the judge's findings, that there was no violation of due process and no unlawful command influence. Answer to Final Brief at 10–11.

## DISCUSSION

### I. Fifth Amendment and Article 31

The granted issues concern allegations of violations of the witnesses' Article 31 and Fifth Amendment rights to remain silent, military due process, and unlawful command influence. Implicit in these issues is whether there was a violation of the Due Process Clause of the Fifth Amendment, and of the Sixth Amendment rights to confrontation, to cross-examination, and to present evidence in one's defense. The specified issue questions whether there was an impermissible *sub rosa*

agreement that "materially prejudiced the substantial rights of appellant."

The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person … shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law…." Article 31(a) of the Uniform Code has similar language. Article 31(d) provides that statements obtained "through the use of coercion, unlawful influence, or unlawful inducement" are inadmissible. To ensure protection of individual rights to prevent coerced statements from admission in violation of the Self-Incrimination Clause of the Fifth Amendment and Article 31, the courts require rights' warnings. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia,* 16 USCMA 629, 635, 37 CMR 249, 255 (1967)(applying *Miranda* to the military). The Sixth Amendment provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him…."

The combined effect of these provisions is a "require[ment] that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

### STANDING

We must first address whether appellant has standing to challenge his conviction based on the following: (1) alleged violations of the witnesses' Article 31 and Fifth Amendment rights to remain silent; and (2) alleged violations of military due process, unlawful command influence, the rights to confrontation and cross-examination, and the right to present evidence.

Standing determines whether a party to a lawsuit may move to suppress evidence or dismiss the charges. The requirement is designed to allow a moving party with a "personal stake in the outcome" to enforce his or her rights. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also United States v. Padilla,* 508 U.S.

77, 81–82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993). A motion to suppress evidence or dismiss the charges is designed generally to deter governmental actions. *See Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Alderman v. United States,* 394 U.S. 165, 174–75, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

Standing will also be granted to prevent a serious risk of unreliable evidence being received at the movant's trial. *See, e.g., United States v. Merkt,* 764 F.2d 266, 273–75 (5th Cir.1985); *People v. Badgett,* 10 Cal.4th 330, 41 Cal.Rptr.2d 635, 895 P.2d 877, 884 (1995). The deterrent value of the exclusionary rule is preserved when standing is granted to protect a personal right of a defendant.

As Justice White, writing for the Court in *Alderman,* stated:

> The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed.... But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.

394 U.S. at 174–75, 89 S.Ct. 961; *see also United States v. Bruton,* 416 F.2d 310 (8th Cir.1969), *cert. denied,* 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428 (1970); *McMahon v. State,* 582 S.W.2d 786 (Tex.Crim.App. 1978).

### *Rights to Remain Silent*

■ Standing will not be granted to one person to challenge violations of another's *Miranda* rights. *State v. Burdgess,* 434 So.2d 1062 (La.1983).

The purpose of *Miranda* warnings is to mitigate the coercion inherent in custodial interrogation. Based on *Miranda, Tempia,*

and Article 31(b), a military suspect subject to custodial interrogation must be apprised by the investigating officer of his or her right to remain silent, right to counsel, and of the consequences of waiving these rights. Mil. R.Evid. 305(c) and (d)(1)(A), Manual for Courts–Martial, United States (1995 ed.).[2] Furthermore, Mil.R.Evid. 305(f), which also has its genesis in *Miranda,* as well as *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), provide that if a suspect invokes the right to remain silent, "questioning must cease immediately," and if a suspect invokes the right to counsel, the "questioning must cease until counsel is present."

The pertinent standing rules are set forth in the Military Rules of Evidence. Mil. R.Evid. 301(b)(1); 311(a)(2); and 321(a)(2). Mil.R.Evid. 301(b)(1) provides: "The privilege of a witness to refuse to respond to a question the answer to which may tend to incriminate the witness is a personal one that the witness may exercise or waive at the discretion of the witness."

■ Applying these concepts, we hold that appellant does not have standing to object to any violation of the Article 31(b) and Fifth Amendment rights of A, B, and C to remain silent. However, he does have standing to object when the actions of the Government impact upon the reliability of the evidence presented against him at trial, *e.g.,* coerced confessions, unlawful command influence, interference with the rights of confrontation or cross-examination, and interference with the right to present evidence.

### II. Confrontation, Cross–Examination, Unlawful Command Influence, and the Right to Present Evidence

The Supreme Court, this Court, Congress, and the President have chosen to regulate grants of immunity, plea bargaining, and pretrial agreements in such a way that ensures openness, and have adopted appropriate provisions to prevent coercive tactics. For in-

**2.** All Manual provisions are cited to the version applicable at trial. The 1998 version is un-

changed, unless otherwise indicated.

stance, the Self–Incrimination Clause of the Fifth Amendment and Article 31 of the Code prevent an individual from being compelled to be a witness against himself or herself. However, a grant of immunity removes these protections and may be offered to secure testimony.

RCM 704(a), Manual, *supra*, recognizes both transactional and testimonial immunity. However, only testimonial immunity is necessary to overcome the privileges under the Fifth Amendment and Article 31. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Either can be part of a pretrial agreement. However, a grant of immunity is required to be in writing and signed by the general court-martial convening authority. RCM 704(d). A grant of immunity is a unilateral agreement based on the action of the convening authority under RCM 704 and may be enforced through various means.

■ While only a general court-martial convening authority may grant immunity pursuant to RCM 704(e), this Court has held that under certain circumstances, a promise by his or her SJA may result in *de facto* immunity. *Cooke v. Orser*, 12 MJ 335 (CMA 1982). That holding has been extended to the special court-martial convening authority, *United States v. Kimble*, 33 MJ 284 (CMA 1991), and his or her representative, *United States v. Churnovic*, 22 MJ 401 (CMA 1986).

■ A *de facto* grant of immunity arises when there is an after-the-fact determination based on a promise by a person with apparent authority to make it that the individual will not be prosecuted. *De facto* immunity, commonly called "equitable immunity," [3] triggers the remedial action of the exclusionary rule and permits enforcement of the agreement. *Cf. United States v. Olivero*, 39 MJ 246, 249 (CMA 1994)(The "Government may not prosecute unless it can show, by a preponderance of the evidence, that the prosecutorial decision was untainted by the immunized testimony."); citing *United States v.*

*Kimble, supra; see also In re Corrugated Container Antitrust Litigation*, 662 F.2d 875, 887 n. 27 (D.C.Cir.1981). Where there is *de facto* immunity, a majority of this Court has held that any evidence derived from such *de facto* immunity will not be admissible unless there is an independent source for the evidence or charges. 39 MJ at 249.

■ In addition to a grant of immunity under RCM 704 and an after-the-fact determination of *de facto* immunity, other jurisdictions have recognized and enforced informal or "pocket" immunity.[4] Whereas *de facto* immunity exists when there is a judicial determination that due process requires that the actions taken constitute immunity, informal immunity exists when there is a voluntary agreement between a government official and a witness not to prosecute that witness based on his or her testimony. An informal grant of immunity may give rise to a judicial determination that the actions taken and promises made constitute *de facto* immunity. RCM 704(c), Discussion. Here, there was an informal agreement between the SJA and the defense counsel for A and C, as well as B, who was unrepresented by counsel.

We agree with the observation of Judge Starr in *Friedrick* that "the practice of granting informal immunity historically has not been the expected norm." *Id.* at 393 n. 14. While we recognize that there was an informal agreement here, we need not address the propriety of granting informal immunity in the military justice system. As in *Friedrick* the question "has not been briefed or argued by the parties." *Id.* Furthermore, the question is not necessary to the resolution of this case. Thus we neither condone nor condemn the actions of the SJA, nor do we bless the practice of granting informal immunity that has been used in other jurisdictions. However, there is nothing to preclude the President from formulat-

---

**3.** *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 770 (Mo.1987); *see also United States v. Ford*, 99 U.S. 594, 603, 25 L.Ed. 399 (1878).

**4.** *United States v. Friedrick*, 842 F.2d 382, 393 n. 14 (D.C.Cir.1988) (Informal immunities have

been "uniformly approved" by a number of Federal courts.).

ing a rule expressly addressing the subject of informal immunity.

RCM 705 provides for pretrial agreements which are negotiated by a government representative and defense counsel. RCM 705(d)(1). The "terms, conditions, and promises between the parties shall be written." RCM 705(d)(2). Mil.R.Evid. 301(c)(2) provides for the disclosure prior to a court-martial of a grant of "immunity or leniency in exchange for testimony." When there is failure to comply with this rule, the "judge may grant a continuance until notification is made, prohibit or strike the testimony of the witness, or enter such other order as may be required." Mil.R.Evid. 301(c)(2).

RCM 705 and Mil.R.Evid. 301 serve different purposes. RCM 705 ensures that there is a voluntary plea with explicit incentives that do not violate public policy. The terms of the agreement should be understood by all parties to the agreement to permit full disclosure at trial and to allow a full inquiry by a judge. The substance of these agreements must be in writing. Thus, the primary goal of RCM 705 is to preclude misunderstandings about the terms of an agreement and to prohibit *sub rosa* agreements. *See* Drafters' Analysis, Manual, *supra* at A21–39.

Mil.R.Evid. 301(c)(2), on the other hand, is designed to reinforce the Government's obligation to disclose exculpatory evidence to the defense. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Even without the Rules for Court–Martial, exculpatory material which could be used for impeachment of government witnesses must be disclosed. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The additional writing requirement established in RCM 705(d)(2) allows full disclosure of the terms to permit examination by both sides at trial.

Open plea bargaining is important to ensure proper confrontation and cross-examination. As we have previously noted, plea bargaining is a function of the convening authority through his or her representative. *United States v. Forester,* 48 MJ 1, 3 (1998). The convening authority is in the best position to decide whether to enter into a pre-trial agreement, whether to grant immunity in exchange for testimony, what type of immunity is appropriate, and whether there should be any limitations on the findings and the sentence in an individual's case. Mutual advantages flow from pretrial agreements.

While we decline either to approve or reject the practice of granting informal immunity, we note that, as in other jurisdictions, it has been enforced by this Court through judicial findings of *de facto* immunity. *United States v. Olivero, supra; Cunningham v. Gilevich,* 36 MJ 94 (CMA 1992). We also note that there are incentives for the Government to grant formal immunity—thus, the wisdom of following the Manual rules. Under informal immunity, the individual may not be prosecuted for refusal to testify, *State ex rel. Munn v. McKelvey, supra,* leaving the Government in a lurch at the time of trial and delaying the trial to obtain a *formal immunity* under the rule. Formal immunity allows the Government to compel the witness to testify or suffer the alternative consequences. Additionally, formal immunity will eliminate post-trial issues over the scope and extent of immunity, i.e., transactional versus testimonial immunity, plus the terms as to future administrative actions. Thus, formal immunity assists in building public confidence because it may eliminate miscommunication.

The informal agreement in this case benefited A, B, and C because it resulted in *de facto* transactional immunity versus testimonial immunity. Additional protection would be furnished by our cases on the subject of a later finding of *de facto* immunity. *See, e.g., United States v. Olivero, supra.*

The initial conversations in this case were between the Deputy Staff Judge Advocate and the senior defense counsel. Later, the conversations were between the senior defense counsel and the Chief of Military Justice. The level of communication reflects the reality that Article 15s would be imposed by the company or battalion commander, two or three levels below the convening authority. In many instances, the convening authority of a large command cannot be involved with

informal discussions concerning non-judicial punishment.

When the informal agreements fell apart, the SJA decided to call the regional defense counsel—that is one level above the senior defense counsel and two levels above counsel for A and C. As to A, B, and C, they received maximum protection under this informal agreement. The SJA's conversation with the regional defense counsel was not to pressure A or C, and implicitly B, or any of the defense counsel, but to set forth practically what would happen if A, B, and C did not testify. Certainly, had they elected not to testify, pleas and statements they made at the Article 15 proceedings could not be admitted at subsequent proceedings against A, B, or C under *de facto* immunity principles. Thus, they would be afforded Article 31 and Fifth Amendment protection. However, they would not be protected against prosecution under their prior voluntary agreements. These voluntary agreements effectively constitute a waiver of Article 31 and Fifth Amendment protections.

In this case, there is no dispute that there was a *de facto* pretrial agreement between the three prosecution witnesses involved in this appeal and the representative of the convening authority. As the judge found, the agreements provided that A, B, and C would have their charges disposed of at the "non-judicial level, probably by field grade Article 15" in exchange for making restitution and testifying truthfully at the trials of the "principal offenders."

If the parties had followed the Manual rules set forth in RCM 704 and 705 and Mil. R. Evid. 301(c)(1), all parties would have known the scope and extent of the immunity, thus eliminating many of the issues we have before us now. Additionally, putting the immunity and Article 15 agreements in writing eliminates impermissible terms, and such an open document will build public confidence in the military criminal justice system.

As discussed in greater detail below, we find no evidence that these actions had an adverse impact on either the reliability of the evidence presented against appellant or appellant's ability to present his defense.

## III. Unlawful Command Influence

Were the SJA's threats to prosecute A, B, and C if they invoked their rights to remain silent at appellant's trial unlawful command influence? Article 37(a), UCMJ, 10 USC § 837(a), prohibits unlawful command influence. It provides that a person subject to the Code may not "by any unauthorized means" try to "influence the action of a court-martial ... in reaching the findings or sentence in any case...." To ensure a fundamentally fair trial, this Court carefully scrutinizes claims of unlawful command influence. *See, e.g., United States v. Thomas*, 22 MJ 388 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

Here, there was *de facto* immunity. No one disputes that the agreements existed or that A, B, and C initially invoked their right to remain silent at the Article 32 investigation.

In some cases, Article 15(f) permits the court-martial of individuals for the same offense for which they received nonjudicial punishment. However, it circumscribes court-martial punishment by requiring consideration of the nonjudicial punishment. RCM 907(b)(2)(D)(iv), on the other hand, recognizes that "[p]rior punishment under" Article 15 for "minor" offenses will bar prosecution. Paragraph 1e, Part V, Manual, *supra*, provides:

Whether an offense is minor depends on several factors: the nature of the offense and the circumstances surrounding its commission; the offender's age, rank, duty assignment, record and experience; and the maximum sentence imposable for the offense if tried by general court-martial. Ordinarily, a minor offense is an offense which the maximum sentence imposable would not include a dishonorable discharge or confinement for longer than 1 year if tried by general court-martial. The decision whether an offense is "minor" is a matter of discretion for the commander imposing nonjudicial punishment, but nonjudicial punishment for an offense other than a minor offense (even though thought by the commander to be minor) is not a bar to trial by court-martial for the same

offense. *See* R.C.M. 907(b)(2)(D)(iv). However, the accused may show at trial that nonjudicial punishment was imposed, and if the accused does so, this fact must be considered in determining an appropriate sentence. *See* Article 15(f); R.C.M. 1001(c)(1)(B).

Under this definition, larceny, filing false claims, and conspiracy would not be considered minor offenses. Without the benefit of the pretrial agreements, A, B, and C would have been subject to prosecution for all three of these non-minor offenses.

Pretrial agreements normally set forth (1) what charges will be dismissed, (2) limitations on the sentence, and (3) a "truthful testimony" provision stating that if the individual does not present truthful testimony, the prosecution is not bound by the agreement. *United States v. Spriggs,* 996 F.2d 320, 323–24 (D.C.Cir.)(Three circuits have adopted the view that the prosecution "may not introduce aspects of the cooperation agreement that could bolster the witness's credibility unless or until the defense attacks his or her credibility," but at least seven circuits "permit[ ] the prosecution on direct examination to introduce the witness's cooperation agreement in its entirety."), *cert. denied,* 510 U.S. 938, 114 S.Ct. 359, 126 L.Ed.2d 323 (1993).

The SJA, in speaking with the RDC, reminded counsel of the voluntary agreement for A and C to testify. He did not order them to testify or seek a contempt citation. He merely spelled out already existing possible alternatives if A and C did not testify pursuant to the voluntary *de facto* pretrial agreement.

In a similar case, *Bordenkircher v. Hayes,* 434 U.S. 357, 363–64, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Supreme Court concluded that it was proper for the prosecutor to present openly to a defendant the unpleasant alternatives of going to trial or entering into a pretrial agreement. While such conduct may impact a witness' testimony, it is an "attribute of any legitimate system" of justice. *Id.* at 364, 98 S.Ct. 663, quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 31, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973). In *Hayes,* the Court held that the prosecutor could carry out his "threat" to indict the defendant as a habitual offender, which would carry a mandatory life sentence, if the defendant did not plead guilty to the existing charge of uttering a forged instrument punishable by 2 terms of 10 years each. 434 U.S. at 358, 362, 98 S.Ct. 663.

Certainly, this Court closely examines the reliability of evidence presented at trial in such circumstances. We recognize that the convening authority, or his or her delegee, should have the option of entering into a pretrial agreement. By the same token, the convening authority should retain the right, as part of plea-bargaining leverage, to court-martial a servicemember who does not comply with the permissible terms of an agreement.

Clearly the better course here would have been for the Government and the witnesses to reduce their pretrial agreements to writing. In cases such as these, an agreement with the SJA regarding the obligation of the witnesses may be hard to prove. Typically, the accused promises to testify against another and, unless there is a written proffer, the Government determines whether the witness has cooperated fully and told the truth. We recognize that written proffers often appear inappropriate because they seem to require certain testimony. On the other hand, when there is a dispute as to whether the truth is being told and there is no proffer, a factual issue arises concerning the agreements. From a practical point of view, the SJA would not attract future cooperating witnesses if he or she did not live up to his or her end of the bargain and proved untrustworthy. Thus, there is some impact on the marketplace of agreements.

Although these agreements should be in writing for the reasons stated above, a threat to prosecute for failure to comply with the pretrial agreement does not constitute an improper withdrawal from the agreement. Rather, it is a statement of intent supported by the rights of the Government in the agreement. The Government did not improperly coerce the testimony of A, B, and C, but merely set forth the rights and obli-

gations of the parties pursuant to the *de facto* agreement. A, B, and C were certainly free to refuse to testify and face the risk of trial.

Mil.R.Evid. 301(c)(2) requires disclosure of the agreement. Here, there was clearly disclosure of the three agreements.

In the presence of the members, there was very effective cross-examination concerning the nonjudicial punishment A, B, and C received. The defense brought out, for example, that A, B, and C were allowed to leave the installation. Further, A, B, and C admitted that they had invoked their right to remain silent at appellant's Article 32 investigative hearing and were testifying at trial as a result of communications between the Government and their defense counsel. While the Government rehabilitated them by establishing that their testimony was consistent with what they originally told the CID, the Government did not try to bolster their testimony with any truthfulness provision implicit in the agreement with the SJA. In addition, the military judge gave a curative instruction to the members regarding how witness credibility could be affected by such an agreement. Finally, the RDC took extensive steps to ensure that while the defense counsel were aware of the SJA's concerns, they did not feel compelled to act in any particular way because of those concerns. The RDC's actions went a long way not only to dispel any possible unlawful influence, but also to dispel its appearance.

Appellant has the burden to show prejudice. When asked to state what other information or what prejudice there was in this case, the defense replied only that it "smells bad." This does not constitute the requisite showing of prejudice.

The decision of the United States Army Court of Criminal Appeals is affirmed.

SULLIVAN, Judge (concurring in the result):

RCM 704(c), Manual for Courts–Martial, United States (1995 edition), states that "[o]*nly* a general court-martial convening authority may grant immunity." (Emphasis added.) RCM 704(d) further says that any such grant "*shall*" be in writing. (Emphasis added.) Both provisions of law were clearly violated here. Thus, the Staff Judge Advocate (SJA) was wrong, clear and simple, on these points. The majority opinion does no service to the formulation of clear case law for the armed forces by hedging its rulings on the propriety of the SJA's actions in this case. As T.S. Eliot said in *Murder in the Cathedral*, part 1 (1935):

> The last temptation is the greatest treason: To do the right deed for the wrong reason.

The majority opinion's in-depth discussion of "informal" immunity might suggest to some that the SJA might have some power to grant immunity in other cases. In this regard, I note Lord Justice Bowen's words of long ago:

> [L]ike my Brothers who sit with me, I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgments come with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that *obiter dicta*, like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases. Therefore I abstain from putting a construction on more than it is necessary to do for this particular case.

*Cooke v. New River Company*, L.R. 38 C.D. 56, 70–71 (1888).

In any event, under the circumstances of this case, I agree with the majority that there was no prejudice in this case. Accordingly, I vote to affirm the decision below.