UNITED STATES, Appellant

v.

BERNARD GERALD GORDON, Private First Class,
U. S. Air Force, Appellee

1 USCMA 255, 2 CMR 161

No. 258

Decided March 19, 1952

COL. Wendell C. Dreier, USAF, and CAPT. William E. Shannon, USAF, for Appellant.

COL. Kenneth B. Chase, USAF, and LT. COL. William H. Ward, Jr., USAF, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused, Bernard Gerald Gordon, was initially charged with two offenses in violation of the 93rd and 96th Articles of War, 10 USC §§ 1565, 1568. The specification of the first charge alleged that on the 5th day of March, 1951, he burglarized the dwelling house of Lieutenant General I. H. Edwards, with intent to commit a felony, to-wit: larceny, therein. The specification of the second charge stated that on the 9th day of March, 1951, he attempted to burglarize the dwelling house of Brigadier General M. J. Lee, with like intent. At the time these offenses were alleged to have been committed, Brigadier General Lee was in command of Headquarters Command, United States Air Force, Bolling Air Force Base, and he was the officer who convened the general court-martial which subsequently heard the case, returned the finding of guilty, and imposed sentence on the accused. In addition, he was the reviewing authority and reviewed the record in that capacity.

Because certain dates are of some importance in considering the issue raised, we set them forth with particularity and in chronological order. The offense involving the home of General Lee occurred on the 9th day of March, 1951. An immediate investigation was started and on the next day a confession was taken from the accused. On the 13th day of March a detailed report was prepared and forwarded to General Lee's headquarters. The charges were sworn to before an officer of his command on March 27, 1951. On April 2, 1951, General Lee issued the order convening the general court-martial and authorized it to try such persons as might be properly brought before it. The charges and specifications were referred to an officer of the command for investigation on April 9, 1951, and on April 20th, he returned his report and recommended a trial by general court-martial, but only on the first charge. Thereafter, on April 27, 1951, the Staff Judge Advocate, legal advisor to General Lee, reviewed the pre-trial investigation record and recommended that the first specification be amended in certain particulars. He further recommended that because the pre-trial statement of the accused, which confessed the attempt to burglarize General Lee's home, was not corroborated by other substantial evidence, that the second charge be dismissed. These recommendations were adopted and the accused was arraigned and tried on the offense of burglarizing the home of General Edwards.

256

On May 29, 1951, the cause came on for trial before the previously appointed general court-martial and a plea of not guilty was entered by the accused. After a hearing on the merits the court-martial found him guilty and sentenced him to be dishonorably discharged from the service, to forfeit all pay and allowances to become due after the date of the order directing the execution of the sentence, and to be confined at hard labor for a period of five years. General Lee, as reviewing authority, approved only so much of the sentence as provided for a dishonorable discharge, confinement at hard labor for two years, and forfeiture of all pay and allowances. The execution of the dishonorable discharge was suspended until a later date. and the forfeiture was deferred until such time as the sentence was ordered into execution. The board of review sustained the finding of the court and the sentence as modified by the reviewing authority. The Judge Advocate General of the Air Force, pursuant to the provisions of Article 67 (b) (2), Uniform Code of Military Justice, 50 USC § 654, certified the case to this Court for determination of one question only.

The question certified for answer is this: Under the circumstances disclosed in this record of trial, was Brigadier General Lee disqualified to act as convening and reviewing authority in this case?

Article of War 8, 10 USC § 1479, which is controlling in this instance because the offense was committed before the effective date of the Uniform Code of Military Justice, designated the commanders authorized to appoint general courts-martial, and then provided as follows:

". . . but when any such commander is the accuser or the prosecutor of the person or persons to be tried, the court shall be appointed by a superior competent authority and may in any case be appointed by superior authority when by the latter deemed desirable."

The question posed is not without difficulty because the second charge, which was later dismissed, alleged an offense which involved an attempt to break and enter the home of General Lee, and this cast him in the role of an apparent accuser. Had the accused been tried on that particular charge there would be no doubt in our minds that the general would have been disqualified to appoint the court to try the charge; but the dismissing of that offense presents the issue in a light more favorable to the contention of the Government.

Conceding the presence of facts to support some of the Government's contentions, we believe it well to point out that one objective Congress had in mind when it enacted the Uniform Code of Military Justice was to eliminate the abuses existing under the old code, including the one involved in this case, and that while the new code is not controlling in this case it points the direction this Court should take when interpreting language which is used in the old act and carried over into the new.

Over the years a bitter controversy has existed over the fairness of a system which grants to a commander, as an attribute of command, the right to select members of a court to try personnel of his command. Without joining either side in that argument, we can say that we would overlook the realities of the situation and the history of military justice if we did not know that Congress intended when it enacted the Uniform Code of Military Justice to modernize the military judicial system and grant to an accused the right to be tried by as fair and impartial a court as is consistent with the maintenance of an efficient military organization; and, that it further intended to narrow the commander's influence on the court by insulating members from any type of control by the commander's expressed direction, or by his moral suasion or persuasion.

The concept that the accuser should not appoint the court is not of recent origin and it is interesting to note that there has been little change in the Articles of War which have controlled this principle. It has been on the statute books for over 100 years, and it should require little argument to establish that it is an important right which must be jealously guarded or abuses will creep in.

The first Congressional enactment we find was passed in 1830. This provided as follows:

". . . whenever a general officer commanding an army, or a colonel commanding a separate department, shall be the *accuser or prosecutor of any officer* in the army of the United States, under his command; the general court-martial for the trial of such officer shall be appointed by the President of the United States." (Italics supplied)

Colonel Winthrop in his "Military Law and Precedents," Second Edition, Reprint 1920, page 61, in discussing the article states:

"This provision was introduced into our military law by an Act of May 29, 1830, as an amendment to the 65th article of the then existing code. The amendment has been held, as we have seen, to be 'plainly restrictive of the preceding legislation,' i.e. the article prior to 1830; its effect being not to add to the authority of the President but to detract from that of the commanders designated. Its purpose clearly was to debar a superior from selecting the court for the prosecution and trial of a junior under his command, and as reviewing authority, passing upon the proceedings of such trial, or executing the punishment, if any, awarded him, in a case where, by reason of having preferred the charge or undertaken personally to pursue it, he might be biased against the accused, if indeed he had not already prejudged his case. The article wholly divests such superior of power to order the court, 'nor could such power be imparted to him otherwise than by a special legislative act.' "

While the first enacted legislation merely disqualified the convening authority when the accused was an officer of the command, as early as 1871 it was held by The Judge Advocate General of the Army that a commanding officer was not competent to convene a court to try an enlisted man when the officer was the accuser. (See In re Bird, 2 Sawy. 33, 3 Fed cases 1429). The act of 1830, however, remained unchanged until 1913, at which time Congress amended the provisions so that the proscription applied regardless of whether the accused was commissioned or not. (37 Stat 723, 1913). Since that time the act has remained substantially unchanged.

As can be anticipated, the troublesome question is not in interpreting the Article of War, but is in determining whether in a given case the convening authority is in fact an accuser. We are helped, however, by the guideposts erected by the authorities and service cases dealing with the subject. Referring again to Colonel Winthrop's work, supra, he has this to say about an accuser: (p 62)

"Whether a commander who has taken action in the case of an officer of his command proposed to be tried, . . . is to be considered as an accuser or prosecutor in the sense of this Article, so as to disqualify him from ordering the court and to make it necessary for the President to do so, is a question depending mainly upon the relation and animus of such commander toward the accused or the case. Where his action had been merely official, the capacity indicated cannot in general properly be ascribed to him. Thus, where, upon the facts of the supposed offence being reported to him, and appearing to call for investigation by court-martial, he has, as commander, directed some proper officer, as the commander of the regiment or company of the accused, or his own staff judge advocate, to prepare the charges, (indicating or not their form,) or has approved or revised charges already prepared, he is not to be regarded as an 'accuser' in the sense of the Article, his action having been official and in the strict line of his duty. . . .

"On the other hand, where, having personally originated or adpoted the charges, he has himself preferred them as his own, or caused them to be preferred nominally by another for him, with the purpose of having them brought to trial, he is in general properly the 'accuser,' even if he may occupy no hostile or adverse position toward the accused."

In 1878, the Attorney General of the United States was called upon for a

ruling as to the true intent of Congress when it used the word "accuser." His opinion can be found in 16 Ops Atty Gen 106, 110 and we quote the part which we conclude established the test used by him.

"He [the convening authority] had no personal relation to, or knowledge of, the matter out of which the charges grew, so as to have created in him any personal feeling or interest in the conviction of the prisoner. In considering alike the question of the propriety of a court-martial and preferment of charges, he dealt with the matter, as a commanding officer must deal in a larger number of instances, upon the statements and allegations of others, and decided the matter in his own mind no further than to pronounce that upon the information before him the alleged offender should be brought before a court-martial."

The formulae prescribed by the early authorities have changed very little as is evidenced by the Manual for Courts-Martial, U. S. Air Force, 1949. Paragraph 5, page 4, of the Manual, explains Article of War 8, supra, in the following terms:

"When any commander authorized to appoint general courts-martial is the accuser or the prosecutor in a case the court shall be appointed by competent superior authority. . . .

"Whether the commander who convened the court is the accuser or the prosecutor is mainly to be determined by his personal feeling or interest in the matter. An accuser either originates the charge or adopts and becomes responsible for it; . . . Action by a commander which is merely official and in the strict line of his duty can not be regarded as sufficient to disqualify him."

Previous service cases have considered this subject and they are in substantial agreement with the general rule quoted from the Manual. In United States v. Steed, ACM 3476, May 10, 1951, 4 CMR(AF) 522 the board of review announced the following principle:

"From the foregoing, it appears that the present rule is to the effect that the appointing authority may not be so connected with the transactions giving rise to the charges that reasonable persons will impute to him a personal feeling or interest in the matter."

In United States v. Sullivan, ACM 59, 2 CMR(AF) 266, the judicial council said at p 278:

"It is not a question, as we see it, whether the Commanding General, . . . did influence the court-martial in this particular case; the question, from a precedent standpoint, is whether, under the circumstances such as those disclosed in this record, such influence upon the Court would be probable."

In United States v. Messer, CM 280656, 53 BR, 279, 282, the board of review made the following observation:

"It is likewise immaterial that General Ritter felt no ill-will toward the accused. The purpose of Article of War 8 is not only to protect the accused from trial by a court appointed by a person actually prejudiced against him, but also to make certain that the appointing authority is so entirely unconnected with the transactions giving rise to the charges that reasonable persons will not impute to him any personal feeling or interest in the matter, but may rely with confidence upon an impartial trial by an unprejudiced court."

We have purposefully developed the origin and history of the rule to emphasize the fact that it has been one of the pillars of military justice and that to weaken it would tend to destroy the system. With a mind to strengthen and not weaken, we answer the two questions: First, was General Lee qualified to appoint the court; and second, was it error for him to act as reviewing authority? In regard to the former, we again quote from United States v. Steed, supra:

"Of course, the jurisdiction of the court is not dependent upon the events of the trial, the validity of its existence in this respect being determined by conditions as they existed when the court was convened, and whether the commander testifies is

**259**

material here only so far as it indicates the state of things when the court was convened."

We adopt that statement as it properly states the time to apply the test, and quote from an opinion rendered by the Attorney General in the case of United States v. Charles D. Coleman, 17 Ops Atty Gen 434, 439, to illustrate the danger inherent in the system if a determination were predicated upon conditions existing at a different time. In discussing the purpose of Article of War 8, supra, he said:

". . . [The purposes are to] guard against results which would not be in harmony with a proper sense of justice, and which might ensue if the officer by whom the charge is made, and who is interested in the issue, were permitted to detail the members of the court which is to try the accused, the danger being that such officer, under the influence of a strong feeling against the accused, might select those who are hostile to the latter or unduly biased in his own favor, and who, for that reason, would be less able to render a fair judgment in the case. . . ."

In fitting the facts of this case to the general principle we do not intend to cast any personal reflections on General Lee. Obviously, we do not know his personal feelings toward the accused, but we are required to determine whether, under the particular facts and circumstances with which we are dealing, a reasonable person would impute to him a personal feeling or interest in the outcome of the litigation.

Our interpretation of the record leads us to the conclusion that there is sufficient evidence to require a █ holding that he was disqualified to convene the court. As previously stated, the accused was taken into custody, investigated for and charged with two offenses, both involving general officers. The one concerning General Lee was committed on the 9th day of March, 1951, and the confession was obtained from the accused on the next day. This was approximately three weeks before the court was ordered convened. Both offenses were thoroughly investigated

and the same written confession had admitted both the burglary of General Edwards' home and the attempt to burglarize the home of General Lee. Accordingly, any notoriety connected with the investigation would publicize both offenses. On the 13th day of March the office of special investigations for the Inspector General of the Air Force submitted a complete written report of the burglaries and a copy of this report was sent to the Commanding General of Headquarters Command. In addition to showing the confession, which was attached as an enclosure, the report stated that both General and Mrs. Lee were interviewed concerning the offense and that they stated that the accused had been in their house earlier in the day and he had seen Mrs. Lee give an orderly a certain sum of money. The general thus knew as early as the 13th day of March that the accused was being investigated for a serious offense involving his home. Moreover, from the notoriety incident to two such burglaries, together with the investigation by members of General Lee's command and a detailed report submitted to his headquarters, it is reasonably certain that he was informed of the confession prior to the time of convening the court. At least, without some showing to the contrary, we must assume that he was fully aware of the important details of the case prior to the time he appointed the court.

Thus, the situation existing at the time of selecting the members of the court was that General Lee knew of the commission of the offense and that the accused had admitted he was the perpetrator. He did not know at that time that the action would be subsequently dismissed, as the report of the Staff Judge Advocate recommending dismissal was not made until some twenty-five days after the court was appointed. Without doubt, at that time he was in every sense an accuser and it is difficult to find that his subsequent acts would revert back and change his status. If we go no further than have the previous service cases, and, as previously suggested, we certainly would go as far as they do, we here find a factual situation where we can say, as a matter of law,

260

that reasonable persons would impute to General Lee at the time he appointed the court a personal feeling or interest in the matter. Congress intended that the court should not be convened by any one who had such an interest in the outcome, and we are convinced that under the peculiar facts of this case any reasonable person would conclude that the accused was met at the threshold of the trial by a court which was selected at a time when the authority knew he had been the victim of a crime for which the accused was to be tried. Such being the case, the reasonable probabilities are that the impartiality demanded by Congress was not present when the selection was made.

The members of the board of review gave careful consideration to this question, and the rationale of their decision is contained in the following paragraph:

"In evaluating the circumstances involved in the instant case it is noted at the outset that the dismissed charge alleged an offense against property, as distinguished from one having a personal aspect, and that such charge alleged merely an attempt and not a consummated depredation. Furthermore, the investigating officer and the staff judge advocate both advised Brigadier General Lee that the indicated evidence would not warrant sending such charge to trial and it was accordingly dismissed. As to the remaining charge it is observed that the alleged offense was reduced from burglary to house-breaking prior to being referred for trial. Such circumstances tend strongly to negate rather than to indicate the presence of personal interest on the part of Brigadier General Lee. Certainly a commander might, through the subterfuge of dismissing the charge alleging the offense from which his personal interest arose, seek to make it appear that his interest in the case is entirely official. The facts here, however, are indicative not only of complete fairness in the premises but of a lack of reason for animus of a personal nature."

It may be conceded that the members of the board of review decided the case in accordance with their interpretation of the previous service decisions and the wording of the Manual, but, if their conclusion is correct, we go further and extend the rule. However, we do not draw the same distinction between offenses against property and offenses against the person as did the board. In both instances it is probable that the victim would be influenced by the crime or attempted crime. No one would gainsay that larceny is not frowned upon by service personnel, particularly where the victim is a member of the service. Furthermore, we do not not believe the true test is the animus of the convening authority. This undoubtedly was the early rule, but as we view it, the test should be whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter. We can not peer into the mind of a convening authority to determine his mental condition, but we can determine from the facts whether there is a reasonable probability that his being the victim of an offense tended to influence a delicate selection. We are convinced that in this case it is reasonable to assume that tendency present. Convening officers should remember that there are easy and adequate means to have a court appointed by one entirely divorced from the offense and if there is any doubt about the propriety of the selection it should be resolved in favor of the accused.

What we have said about the first question applies with equal force to the second. There are, however, one or two additional reasons which might be added. In a general court-martial the convening and reviewing authorities are the same and if the officer is disqualified from convening he should not be qualified to review. The reviewing authority is vested with great power over the proceedings of a court-martial. He is at liberty to approve or disapprove the finding of guilty or to approve only so much of a finding of guilty of a particular offense as involves

**261**

a finding of guilty of the lesser included offense, and he has the power to approve or disapprove the whole or any part of a sentence. Such power should not be vested in a person who is interested in the litigation.

At the time General Lee made his review the whole pre-trial procedure was available to him. The confession was attached as part of the record and he knew that the accused was freed from trial on the second charge for a reason which many reasonable persons would conclude was a legal technicality. The accused was a first offender and he was sentenced to confinement for five years. Any reduction in the amount of his sentence imposed on the one charge was solely and exclusively within the control of a person who had been offended against, and it could be adjusted according to his conscience. Human behavior is such that an injured party might be inclined to be more severe in approving the sentence than would a person entirely untouched by the crime. While General Lee reduced the sentence, who can say what, if any, additional remission might have been made by one who had no interest in the matter.

Again, the right to an impartial review is an important right which must be recognized in the military judicial system and an accused is entitled to have the record reviewed and the limits of his sentence fixed by one who is free from any connection with the controversy.

Accordingly, we find substantial rights of the accused were materially prejudiced, and we answer the question certified as follows: Under the circumstances of this case Brigadier General Morris J. Lee was disqualified to act as convening and reviewing authority in this case.

The holding of the board of review is reversed and the cause remanded to the Judge Advocate General of the Air Force for action not inconsistent with this opinion.

Chief Judge QUINN concurs.

PAUL W. BROSMAN, Judge: (concurring in the result)

I concur fully in the result in this case.

I do not understand Judge Latimer to evaluate the error it contains as jurisdictional—whatever exactly this term may mean. I do understand him to have concluded that the substantial rights of the accused were materially prejudiced. I am sure he is correct in this determination. Without, however, inquiring whether the record reflects a basis for a finding of specific prejudice as developed in United States v. Lee. (No. 200), 1 USCMA 212, decided March 13, 1952, 2 CMR 118, I prefer to bottom my concurrence on the concept of general prejudice, as applied by this Court in United States v. Berry, (No. 69), 1 USCMA 235, decided March 18, 1952, 2 CMR 141. See also United States v. Bound, (No. 201), 1 USCMA 224, decided March 13, 1952, 2 CMR 130.