UNITED STATES, Appellee

v.

Warren L. DINGES, Captain
U. S. Air Force, Appellant

No. 97-0597

Crim. App. No. 32122

United States Court of Appeals for the Armed Forces

Argued December 6, 2000

Decided August 22, 2001

CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE and BAKER, JJ., joined.  BAKER, J., filed a concurring opinion.  EFFRON, J., filed a dissenting opinion, in which SULLIVAN, J., joined.

<u>Counsel</u>

For Appellant:  <u>Charles W. Gittins</u> (argued); <u>Colonel James R. Wise</u>, <u>Lieutenant Colonel Timothy W. Murphy</u>, and <u>Captain Karen L. Hecker</u> (on brief).

For Appellee:  <u>Major Jennifer R. Rider</u> (argued); <u>Colonel Anthony P. Dattilo</u> and <u>Major Lance B. Sigmon</u> (on brief).


Military Judges:  Michael B. McShane and Gregory E. Pavlik

<u>**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**</u>**.**

<u>United States v. Dinges</u>, No. 97-0597/AF

Chief Judge CRAWFORD delivered the opinion of the Court.

After an oral argument on May 12, 1998, we ordered a <u>DuBay</u>[1] hearing to determine whether the special court-martial convening authority, who ordered the pretrial investigation and recommended referral to a general court-martial, was disqualified because of an "other-than-official interest in appellant's prosecution." 49 MJ 232, 235 (1998). After the record of the <u>DuBay</u> hearing was returned to this Court, we granted review of the following issues:

> I. WHETHER THE SPECIAL COURT-MARTIAL CONVENING
> AUTHORITY WAS SO CLOSELY CONNECTED TO THE OFFENSE
> THAT A REASONABLE PERSON WOULD CONCLUDE THAT HE
> HAD A PERSONAL INTEREST IN THE MATTER WHERE THE
> CONVENING AUTHORITY WAS A DIRECTOR (AND THUS A
> FIDUCIARY) AND A DISTRICT CHAIRMAN IN THE VICTIMIZED
> ORGANIZATION, WHERE HE WAS PERSONALLY APPROACHED
> IN HIS CAPACITY AS DIRECTOR BY ANOTHER LEADER IN
> THE ORGANIZATION FOR ASSISTANCE IN HAVING APPELLANT
> INVESTIGATED FOR CONSENSUAL SEXUAL ACTIVITY, WHERE
> HE THEN INITIATED THE INVESTIGATION AND WHERE THE
> CONVENING AUTHORITY SUBSEQUENTLY OBTAINED COMMAND
> AND SPECIAL COURT-MARTIAL AUTHORITY OVER APPELLANT.
>
> II. WHETHER THE FINDINGS AND SENTENCE OF APPELLANT'S
> COURT-MARTIAL MUST BE SET ASIDE WHERE APPELLANT'S
> PLEA OF GUILTY WAS PROCURED BY FALSE AND FRAUDULENT
> STATEMENTS MADE BY AIR FORCE OFFICIALS TO THE
> DEPARTMENT OF JUSTICE IN ORDER TO OBTAIN A GRANT OF
> IMMUNITY FOR A VITAL GOVERNMENT WITNESS, WHERE THE
> GOVERNMENT FAILED TO PRODUCE THE DOCUMENTS CONTAINING
> THESE FALSE STATEMENTS TO APPELLANT DURING DISCOVERY
> AT THE TRIAL AND APPELLATE LEVEL AND WHERE THE STAFF
> JUDGE ADVOCATE WAS AWARE OF THE FALSE STATEMENTS
> DURING THE POST-TRIAL PROCESSING OF APPELLANT'S
> COURT-MARTIAL BUT FAILED TO ADDRESS THIS ERROR IN
> THE ADDENDUM TO THE STAFF JUDGE ADVOCATE'S
> RECOMMENDATION.

---

[1] <u>United States v. DuBay</u>, 17 USCMA 147, 37 CMR 411 (1967).

We hold contrary to appellant's contentions for the reasons set forth below.

## FACTS - ISSUE I

Colonel (Col) M, the special court-martial convening authority, testified at the DuBay hearing that he was stationed at Tinker Air Force Base (AFB) from 1991 to 1996, first as the Vice Commander, then as the Wing Commander. As the Vice Commander, he had little contact with the Boy Scouts. When he became Wing Commander, he was asked and accepted, like his predecessor, to be the District Chairman of one of eight Boy Scout districts in Oklahoma.

The Wing Commander has a prominent position at Tinker AFB. He is the individual on base who interfaces with the community, including the Chamber of Commerce, the Oklahoma City Neighborhood Initiatives Program, and the Oklahoma Military Advisor Committee. Col M also formed the Oklahoma City Bombing Disaster Control Group. He was deeply involved with that Control Group for nearly 24 hours a day from April 19, 1995, for 10 days, and 12 hours a day for 6 weeks thereafter.

Prior to becoming District Chairman, an unsalaried position, Col M's only contact with the Boy Scouts was as a Scout when he was a child, and a parent of a Scout from 1986-91. Personally, he was not overly involved with the Boy Scouts as a youth. He reached the rank of Star (two levels below Eagle Scout) and was

3

also a member of the Order of the Arrow.  The district chairmanship did not consume a tremendous amount of time -- meeting less than once a quarter.

Col M learned of the allegations against appellant from Mr. Moore, a full-time paid Scout employee, at a district meeting. Col M contacted the Staff Judge Advocate (SJA) and took actions similar to any case reported to him, initiating an investigation,[2] appointing an Article 32[3] investigating officer, nominating a slate of court members as per standard operating procedure, and forwarding the charges to the general court-martial convening authority.  Col M never told Mr. Moore what actions he took; nor did Mr. Moore ask or pressure him in any way.  Furthermore, Col M did not know any of the Scouts who had made allegations against appellant, and was not contacted by any family member.

Appellant's transfer to Tinker AFB from Wright Patterson AFB, where he was administratively assigned but not physically located while attending college, was solely to ease the investigation and potential trial and not out of any personal interest.  Since appellant was a Doctor of Philosophy candidate in Chemistry at the University of Oklahoma, his transfer to the Wing at Tinker AFB resulted in him being gainfully employed by the Director of Environmental Management at the Air Logistics

---

[2] It was because of the "don't ask don't tell" policy that he called the Office of Special Investigations and asked them to initiate the investigation.
[3] Uniform Code of Military Justice, 10 USC § 832.

4

Center.  Prior to assigning appellant to the Environmental Management Director, Col M met with appellant and told him that he should take all the time necessary to work on his defense because this would be a very stressful time in his life.  When not working on his defense, Col M told appellant to work hard for the Director because character evidence makes a difference at trial.  He then personally drove appellant over to meet the Director.

At the DuBay hearing, the SJA described Col M's Boy Scout role as an "honorary and nominal position[] in his relations in the community."  He was merely a figurehead.  When asked by the defense if being District Chairman was an appointment duty, he responded:  "[I]t was like many of his other duties, an honorary or a very nominal duty."

Col M was not even sure he told the SJA of his position with the Boy Scouts.

DISCUSSION - ISSUE I

Article 1(9), Uniform Code of Military Justice, 10 USC § 801(9), defines an "accuser" as

> a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than an official interest in the prosecution of the accused.

This provision was first enacted as an amendment to Article of War 65.  This Article has been described as disqualifying a person from convening a court-martial who, "by reason of

5

having preferred the charge or undertaken personally to pursue it, ... might be biased against the accused, if indeed he had not already prejudged his case." William Winthrop, Military Law and Precedents 62 (2d ed. 1920 Reprint); see Arts. 22(b) and 23(b), UCMJ, 10 USC §§ 822(b) and 823(b). Moreover, Professor Davis describes an accuser as one who "initiates a charge out of a hostile animus toward the accused or a personal interest adverse to him...." George B. Davis, A Treatise on the Military Law of the United States 20 (3d ed. Revised 1913).

Similarly, this Court has found that there is a personal interest when the convening authority is the victim of the accused's attempted burglary, United States v. Gordon, 1 USCMA 255, 2 CMR 161 (1952); where the accused tries to blackmail the convening authority by noting that his son was a drug abuser, United States v. Jeter, 35 MJ 442 (CMA 1992); and where the accused has potentially inappropriate personal contacts with the convening authority's fiancée, United States v. Nix, 40 MJ 6 (CMA 1994). However, a convening authority is not disqualified because of "misguided prosecutorial zeal," United States v. Voorhees, 50 MJ 494 (1999), or where the convening authority issues an order that the accused violates. United States v. Tittel, 53 MJ 313 (2000).

Col M had no animus towards appellant and sought to ensure his gainful employment at Tinker AFB while the investigation was

United States v. Dinges, No. 97-0597/AF

ongoing. Col M's role with the Boy Scouts has been properly described as titular and "an honorary and nominal" position.[4] The initiation of charges was what any commander would do, and this is demonstrated by the fact that there were no further communications after the initial report made by Mr. Moore. Certainly, Col M was not the victim, was not an individual being blackmailed, and in fact, took less action than the commander in Tittel. For these reasons, we hold that Col M did not have "an interest other than an official interest" in appellant's case.

## FACTS - ISSUE II

Prior to appellant's plea at his trial on November 14, 1995, the defense was informed that the victim was given a grant of immunity. However, the victim continued in his refusal to testify, despite the immunity. Defense indicated after a session under RCM 802, Manual for Courts-Martial, United States (2000 ed.),[5] that they had no notice of the immunity given to the Scout. At the request of the judge, the Government gave the defense a copy of the grant of immunity from the Department of Justice, as well as the Tinker AFB Staff Judge Advocate's letter seeking the grant of immunity. Those documents describe the victim's age as 16. However, the defense was not given other

---

[4] Commanders and convening authorities, because of their military positions, are often called upon to provide services to a host of civic organizations, both on base and in the surrounding communities. While nothing herein should discourage this practice, care should be taken to avoid potential disqualification due to an appearance of personal interest in a matter.
[5] All Manual provisions are identical to the ones in effect at the time of appellant's court-martial.

7

documents prepared by attorneys at Bolling AFB and transmitted to the Department of Justice that misstated the victim's age.

The only motion made at that time was to dismiss the charges on the basis that Article 125, Uniform Code of Military Justice, 10 USC § 925, is constitutionally defective. The defense also moved to dismiss on the grounds that the prosecution of the accused was in violation of Equal Protection rights under the Constitution; appellant had been singled out because of his sexual preference that violated Department of Defense Directives. The judge denied both motions, and they are not at issue in this case.

DISCUSSION - ISSUE II

Issue II raises questions of standing and mootness. Assuming, without deciding, that the defense is correct in its assertion that the Department of Justice gave the victim immunity under the mistaken belief that he was under 16 years of age when his sodomous relationship with appellant occurred, that issue is now moot. The Government never called the victim as a witness. See United States v. Napoleon, 46 MJ 279, 281-82 (1997); United States v. Loving, 41 MJ 213, 258 (1994)(applying mootness to the question of misconduct of judge). Secondly, the doctrine of invited error precludes any relief. The victim was called by the defense during the sentencing portion of the trial. Thus, any error as to the admission of the testimony was invited by the defense when they called the witness themselves. See, e.g.,

8

United States v. Dinges, No. 97-0597/AF

United States v. Reid, 46 MJ 236 (1997); United States v. Raya, 45 MJ 251 (1996); United States v. Schnitzer, 44 MJ 380 (1996).

Thirdly, appellant does not have standing to raise the violation of another's Fifth Amendment rights. United States v. Johnson, 53 MJ 459, 461 (2000); United States v. Golston, 53 MJ 61, 64 (2000); United States v. Jones, 52 MJ 60, 63-64 (1999). Additionally, the record is clear that appellant pled guilty to prevent the victim from facing the consequences of refusing to testify after receiving a grant of immunity.

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

BAKER, Judge (concurring)

A.   Meaning of Accuser

This case is about the meaning of RCM 601, Manual for Courts-Martial, United States (1995 ed.), as determined by the plain language of the rule and this Court's case law. RCM 601(c) states: "An accuser may not refer charges to a general or special court-martial."  "The term 'accuser' means a person who signs and swears to charges, any person who directs that charges nominally be signed and sworn to by another, and any other person who has an interest other than an official interest in the prosecution of the accused."  Art. 1(9), Uniform Code of Military Justice, 10 USC § 801(9)(emphasis added).  This Court's case law puts further flesh on the meaning of the phrase "other than an official interest in the prosecution of the accused."

Personal interests relate to matters affecting the convening authority's ego, family, and personal property. A convening authority's dramatic expression of anger towards an accused might also disqualify the commander if it demonstrates personal animosity.  United States v. Voorhees, 50 MJ 494, 498 (1999).  However, an officer need not act with animus or anger to become an accuser.  United States v. Allen, 31 MJ 572, 589 (NMCMR 1990).  In applying RCM 601, this Court has said that we "cannot peer into the

mind of a convening authority to determine his mental condition, but we can determine from the facts whether there is a reasonable probability that his being the victim of an offense tended to influence a delicate selection." United States v. Gordon, 1 USCMA 255, 261, 2 CMR 161, 167 (1952).

Since its inception, this Court has consistently applied a contextual RCM 601 test: "[W]hether, under the particular facts and circumstances . . . a reasonable person would impute to [the convening authority] a personal feeling or interest in the outcome of the litigation." United States v. Jeter, 35 MJ 442, 445 (quoting United States v. Gordon, supra at 260, 2 CMR at 166). In Voorhees, for example, the Court looked to the record and found that it "contain[ed] no evidence of personal interest on the part of the officer acting in appellant's case[.]" 50 MJ at 499. Congress has not chosen to legislate a different, more stringent test, such as those familiar in other contexts based on the possibility of a conflict, or the appearance of a conflict.[*]

---

[*] There are a number of inherent and facial tensions within the military justice system and the chain of command which arguably create the appearance of a conflict of interest. The convening authority, for example, not only decides whether to prosecute charges at court-martial, but is also responsible for selecting the members of the court. Nonetheless, Congress has not chosen to disqualify the convening authority from selecting members of the jury.

2

In <u>United States v. Nix</u>, 40 MJ 6 (CMA 1994), the Court determined that the appellant was entitled to a factual review as to whether the convening authority had a personal interest in the outcome of litigation, where the appellant was charged, <u>inter alia</u>, with inappropriate contacts with the convening authority's girlfriend (and subsequently wife). As is clear from <u>Nix</u>, this Court has eschewed a <u>per se</u> rule, or appearance-of-conflict rule, when it comes to the meaning of the term "accuser." If the appearance or possibility of a conflict was the test, I cannot imagine a clearer exemplar than <u>Nix</u>, and yet, the case was remanded to allow the appellant an opportunity to present evidence on the issue of the convening authority's "<u>possible</u> bias against him" and, presuming the truth of the appellant's assertions, to determine prejudice. <u>Id</u>. at 7 (emphasis added).

Moreover, the role of an accuser is judged on a factual continuum rather than with absolute thresholds. In <u>Allen</u>, the court reiterated that "[t]he basic test for determining whether the convening authority is an accuser is whether he is 'so closely connected to the offense that a reasonable person would conclude that he has a personal interest in the matter.'… Thus, when a convening authority directs an action or bases his decision on a personal

3

rather than an official interest, he is statutorily disqualified from acting as a convening authority."  31 MJ at 585 (quoting Gordon, supra at 261, 2 CMR at 167).

This Court has already recognized the applicability of the contextual Gordon test to this case, stating on remand: "At the heart of the granted issue is the following question:  Was Col. M so closely connected with this offense that a reasonable person would conclude that he had a personal interest in this case?"  49 MJ at 234 (emphasis added).  How closely connected was Col M?  The record reflects the following:

- Col M was affiliated with the Boy Scouts of America (BSA) because he was in a position of community interface as Wing Commander and previously as Vice Commander.

- He was not affiliated with the BSA as an adult before or after he held these official positions.

- There is no indication in the record that appellant's troop was within Col M's district; Col M testified that, to his knowledge, it was not.

- Col M had never met appellant before his transfer to Tinker AFB.

- He did not know any of the alleged victims.

- He viewed his affiliation with the BSA as irrelevant to appellant's case.

- He never responded or advised the BSA as to the status of the case.

For these reasons, the lower court found "no evidence of personal involvement by Col M in either the investigation of the charges or the appellant's transfer to Tinker AFB."  Unpub. op. at 3.  This factual finding was not clearly erroneous.  Based on these "particular facts and circumstances" and the law as reviewed above, I concur in the judgment of this Court that Col M was not an accuser for the purposes of Article 1(9).  To paraphrase the analysis in United States v. Tittel, 53 MJ 313 (2000), I find it unlikely, given the nature of the allegation against appellant, that any competent authority would not have referred this case to the Office of Special Investigations (OSI) for appropriate investigation. Moreover, the record reflects that Col M did not act out of a sense of loyalty, duty, or legal obligation to the BSA; after the matter was brought to his attention by Mr. Moore, he did not have any contact with the BSA regarding this matter.  Indeed, he never responded to Mr. Moore, as to the disposition of his inquiry.

5

In hindsight, with all the benefit of retrospect, Col M might have avoided this issue by stepping out of the process. However, he was not required legally to do so.

B. Waiver

Appellant is not well situated to complain. During discovery, appellant's counsel received the statement of Paul Moore, the BSA executive who asked Col M to look into this matter. This four-page statement includes the following reference to Col M:

> 6/3/95 – I talked with Big Teepe [Sic] District Chairman, Col [M]. He indicated the Air Force would look into the case.

The DuBay record indicates that Moore's statement would have been provided to appellant sometime after his discovery request of October 12, 1995, but prior to October 24, 1995, on which date a subsequent Government response to discovery states that the Government previously provided the OSI report of investigation to appellant During this same time period, appellant would have known that Col M was taking official actions regarding his case. Among other things, Col M signed the appointing order for an Article 32 investigation. A copy of this appointing order would have been disseminated to defense counsel prior to the investigation and would have been included with the Article 32 investigation report provided to counsel. Appellant

would have had 5 days to submit objections to this report. RCM 405(j)(4).

On October 25, 1995, one day after we can be certain appellant was in possession of Mr. Moore's statement, Col M transmitted to the convening authority a recommendation for a general court-martial. Presumably, appellant and counsel would have been in receipt of a copy of this document before trial as well. Nonetheless, appellant did not raise his concerns regarding Col M's possible position as an "accuser" until his appeal to the Court of Criminal Appeals.

Appellant might have tested whether Col M was an "accuser" for the purposes of RCM 601(c) prior to the appellate process. However, because the CCA has not erred in applying RCM 601 to this case, we need not decide whether the one sentence in Mr. Moore's statement provided a sufficient foundation to find that appellant waived his RCM 601 claim.

7

United States v. Dinges, No. 97-0597/AF


EFFRON, Judge, with whom SULLIVAN, Judge, joins (dissenting):

The majority opinion concludes that it was permissible for Col M to act as the special court-martial convening authority in the present case. Col M, however, was subject to conflicting interests which precluded him from exercising the prosecutorial discretion of a special court-martial convening authority under applicable statutes, rules, and case law. See Arts. 1(9), 22(b), and 23(b), UCMJ, 10 USC §§ 801(9), 822(b), and 823(b); RCM 401(c)(2)(A), Manual for Courts-Martial, United States (2000 ed.); United States v. Gordon, 1 USCMA 255, 261, 2 CMR 161, 167 (1952); United States v. Nix, 40 MJ 6 (CMA 1994). I respectfully dissent.


## I. BACKGROUND

### A. The exercise of prosecutorial discretion by court-martial convening authorities

The special court-martial convening authority plays a pivotal role in the military justice system, with broad discretion over the disposition of allegations and charges. Under RCM 306 and RCM 404, Manual, supra, Col M had virtually unfettered authority to choose among a variety of options, including: (1) follow the lead of civilian authorities and take no action; (2) dismiss any charges that may have been preferred;

(3) take administrative action; (4) institute nonjudicial punishment proceedings; (5) refer the charges to a summary court-martial; (6) refer the charges to a special court-martial; or (7) order an investigation under Article 32, UCMJ, 10 USC § 832. After receiving the report of the Article 32 investigating officer, Col M had the authority to take any of the actions available to him prior to the investigation, as well as the option -- which he exercised -- of forwarding the matter to a superior commander for consideration of referral to a general court-martial. See RCM 404(c). Although a servicemember's fate ultimately rests with the forum in which a case is considered, the exercise of prosecutorial discretion by the special court-martial convening authority is a critical decision point, particularly in terms of the severity of possible punishment.

To ensure that court-martial convening authorities exercise their considerable discretion with objectivity and without influence of personal interest, Articles 22(b) and 23(b) prohibit a commanding officer from convening a general or special court-martial when that officer is an "accuser." The definition of "accuser" under the Code includes a "person who has an interest other than an official interest in the prosecution of the accused." Art. 1(9); see also RCM 401(c)(2). A commanding officer who is disqualified from functioning as a

2

convening authority because he or she is an accuser must forward the charges for disposition by a superior convening authority. See Arts. 22(b) and 23(b); RCM 504(c)(3), Manual, supra.

### B. The relationship between Col M's interests and the investigation of appellant

As we noted in our initial review of this case, "At the heart of the granted issue is the following question:  Was Col M so closely connected with this offense that a reasonable person would conclude that he had a personal interest in this case?" 49 MJ at 234.  The factual background concerning Col M's interest is detailed in the record of the proceedings we ordered under United States v. Dubay, 17 USCMA 147, 37 CMR 411 (1967). When Col M assumed command of the 72nd Air Base Wing at Tinker Air Force Base (AFB) in July 1994, local Boy Scout officials asked him to be Chairman of the Big Teepee District of the Boy Scouts, one of eight districts in Oklahoma.  Col M initially declined the request, but he reconsidered and decided to serve as Chairman because "he thought he could get good people to pay attention to them [the Boy Scouts organization] and to help them raise money[.]"  The Council held 6 bimonthly meetings each year, and Col M attended "approximately 4" of the 6 meetings.

As Chairman of the Big Teepee District, Col M "was automatically also a member of the Board of Directors for the Last Frontier Council . . . a separately incorporated local Boy

3

Scout council serving central, western, and southwestern portions of the State of Oklahoma." The Board of Directors exercised responsibility over the annual fundraising campaign. As a member of the Board, Col M "was responsible for contacting 10 to 12 fairly prominent people in the community and giv[ing] each of them a list of names to call and ask for money on behalf of the Boy Scouts."

Mr. Paul Moore, a central figure in the events that led to appellant's court-martial, was the Executive Director of the Last Frontier Council. As a salaried employee of the Boy Scouts, he was responsible for the day-to-day operations of the Council and accountable to the Council's Board of Directors. In November 1994, Mr. Moore heard of alleged sexual relationships between appellant, who then was an assistant scoutmaster of a troop, and several Boy Scouts. After "verif[ying] the information in his own mind," Mr. Moore confronted appellant, who confirmed one such relationship. Mr. Moore thereupon suspended appellant's involvement in the Boy Scouts.

After this meeting, Mr. Moore contacted civilian "local law enforcement officials to explore possible investigation concerning Captain Dinges' conduct." The civilian officials advised Mr. Moore that because appellant's alleged relationship involved an individual who was older than 16 years of age, the

4

age of consent in Oklahoma, the civilians "were not interested in prosecuting" appellant.[*]

On June 3, Col M attended the Last Frontier Council meeting at the Scout Service Center in Oklahoma City. Mr. Moore approached Col M, who was wearing his Air Force uniform, and "indicated that he had received information about an improper relationship between Captain Dinges and a Boy Scout." Mr. Moore asked "if this was something that the Air Force should be aware of," and Col M responded that "he was not sure, but that it was something the Air Force should look into and an investigator would contact Mr. Moore."

Later that day, Col M contacted his Staff Judge Advocate, who confirmed that the matter fell "within the scope of matters for investigation." The following day, Col M provided the Air Force Office of Special Investigations (OSI) with the information he received from Mr. Moore. The OSI, in turn, obtained permission to open an investigation from appellant's commander at the Air Force Institute of Technology (AFIT).

C. Col M's exercise of prosecutorial discretion

In August, appellant's commander was advised that the

---

[*] The record also indicates that in May 1995, Mr. Moore heard of contact between appellant and two 15-year old Boy Scouts, but it does not provide any details, and this information was not reflected in the charges against appellant.

investigation was complete, that there was "sufficient information to disenroll Captain Dinges" from the PhD program in which he was a full-time student, and that the "recommended approach" was to transfer control of appellant from the AFIT to Tinker AFB. The commander agreed and called Col M to determine whether it was possible to transfer appellant to an organization at Tinker AFB "while the court process was being facilitated." Col M agreed to the reassignment of appellant. Appellant was designated as a "special assistant" to Col M, and he was assigned to work in the Environmental Management Directorate.

Col M directed an Article 32 investigation into the allegations, and the investigating officer recommended that charges be referred to trial by a general court-martial. Col M forwarded this recommendation to the general court-martial convening authority with his concurrence and recommended the names of possible court-members. Col M did not disclose his affiliation with the Boy Scouts of America when he forwarded his recommendation to the general court-martial convening authority.

## II. DISCUSSION

Col M held high-level positions of responsibility in the Boy Scout organization. He was a District Chairman and, in that capacity, served as a member of the Council's Board of

6

Directors.  As such, he owed a fiduciary duty of loyalty to the Boy Scouts.  See Okla. Stat. Ann. tit. 18, § 1006B.7.a; Resolution Trust Corp. v. Greer, 911 P.2d 257, 261 n.9 (Okla. 1995); Wilson v. Harlow, 860 P.2d 793, 798 (Okla. 1993).  This was more than a nominal position.  An important element of his responsibilities involved using his influence to persuade persons of means to financially support the Boy Scouts.

The subject of homosexuality is a highly charged matter for both the Boy Scouts, see Boy Scouts of America v. Dale, 530 U.S. 640, 644 (2000) (sustaining the Boy Scouts' First Amendment right to eject an admitted homosexual assistant scoutmaster from adult membership), and for the armed forces, see 10 USC § 654 (policy concerning homosexuality in the armed forces).  With respect to the allegations against appellant, the impact on each entity was not necessarily the same.  Because the impact could vary, there was a reasonable possibility that each organization's assessment of the proper disposition of the charges, and the factors considered in that process, would differ.

The potential conflict between Col M's personal interest in the impact the allegations might have on his fundraising and other activities with the Boy Scouts, on the one hand, and his role as appellant's Air Force commander, on the other, is precisely the type of situation that Congress sought to avoid

7

when it disqualified an accuser from serving as a special or general court-martial convening authority.  We need not question Col M's good faith, self-assessment of impartiality to find that his personal interest disqualified him from serving as a special court-martial convening authority.  The majority finds it noteworthy that Col M was not the victim of appellant's conduct, and that he was not blackmailed by appellant.  The test, however, is not whether a commander exhibited bias or prejudice, but simply whether the commander had "an interest other than an official interest in the prosecution of the accused." Art. 1(9).  Because Col M had such an interest, he was disqualified from exercising authority over appellant's case and should have notified the general court-martial convening authority under RCM 401(c)(2).  Under these circumstances, the findings and sentence should be set aside and the case should be returned to the Judge Advocate General with authority to order a rehearing.  See Nix, 40 MJ at 8.